J. GORDON BARNES ET AL. *v.* COMMISSIONER
OF LABOR AND INDUSTRY, DIVISION OF
LABOR AND INDUSTRY, MARYLAND
DEPARTMENT OF LICENSING AND
REGULATION ET AL.

[No. 996, September Term, 1979.]

*Decided April 15, 1980.*

The cause was argued before THOMPSON, WILNER and MacDANIEL, JJ.

*H. Emslie Parks* and *Leland S. VanKoten,* with whom were *Wright & Parks* on the brief, for appellants.

*Henry R. Wolfe, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Francis X. Pugh, Assistant Attorney General,* on the brief, for appellee Commissioner of Labor and Industry, Division of Labor and Industry, Maryland Department of Licensing and Regulation. *Howard J. Schulman,* with whom was *Peter G. Angelos* on the brief, for other appellees.

WILNER, J., delivered the opinion of the Court.

Appellant M. Nelson Barnes & Sons, Inc. (Barnes, Inc.) was a subcontractor on two public school construction projects — Fallston Senior High School in Harford County and Owings Mills High School in Baltimore County. Both projects were deemed subject to the State Prevailing Wage Law (Md. Ann. Code art. 100, § 96, *et seq.,* hereafter referred to as "PWL"),[1] and, accordingly, prevailing wage rates for each job classification had been determined by the Commissioner of Labor and Industry. At some point, one or more of its employees complained to the Commissioner that Barnes, Inc. was violating PWL by failing to pay the prevailing rate for steamfitters to employees doing steamfitting work. Specifically, it was alleged that appellant had misclassified persons doing steamfitting work as plumbers or mechanics and had paid them the prevailing

---

1. *See Demory Bros. v. Bd. of Pub. Works,* 273 Md. 320 (1974).

rate for plumbers, which was lower than that for steamfitters.

After investigation, the Commissioner designated an examiner to conduct a hearing into the matter.[2] Present at the hearing were counsel for Local 438 of the Steamfitters union, Local 48 of the Plumbers union, and the Baltimore Building & Construction Trades Council (the Trades Council), an umbrella organization composed of the various construction trade unions (hereafter collectively referred to as "the unions"). Barnes, Inc., a non-union contractor, objected to their presence because none of the unions represented any of its employees; but the hearing examiner nevertheless declared them to be "interested persons," and thus allowed them not only to remain but to participate in the hearing through the cross-examination of witnesses and the presentation of argument.

The evidence was presented chiefly by an Assistant Attorney General assigned to the Commissioner. *See* COMAR 09.12.51.05F. At the end of the third day of hearing, it appeared that he had concluded his case; and the hearing examiner turned to counsel for Barnes, Inc., asking if he wished a continuance before commencing his client's case. At that point, counsel for the Trades Council indicated his desire to subpoena certain records and witnesses from Barnes, Inc. After some discussion as to the Trades Council's authority to initiate such a subpoena, the Assistant Attorney General decided that "as a party of interest, they [the Trades Council] have a right to subpoena themselves, so if they make a request for subpoenas, they will be issued by the Commissioner, and as such, they will be honored. So it's not a question of whether the State is doing it." The examiner then concluded that such evidence as the Trades Council desired to present would be deemed "part of the Commissioner's case," and that, as a result, "the State hasn't completed its case." The hearing was then recessed.

On November 24, 1978, the Commissioner issued identical subpoenas to appellants, Barnes, Inc. and its

---

2. *See* COMAR 09.12.51.05, authorizing the designation of a hearing examiner.

president J. Gordon Barnes, directing them to appear at the continued hearing on December 6, 1978, and to bring with them virtually all writings and documents pertaining to the two construction projects. Each subpoena stated that its recipient was being called "to testify as a witness . . . at the request of the [Trades Council]."

Appellants made no move to quash these subpoenas. At the appointed time, their counsel appeared, requested (and received) permission to call a witness "out of turn," and proceeded to examine that witness. Counsel then announced that neither of the appellants intended to comply with the subpoenas, upon the advice of counsel, because (1) they were improperly issued, and (2) they were overbroad. The gravamen of the first objection was that the subpoenas were issued solely at the behest of the unions, who were not "interested persons" and were therefore not entitled to participate in the proceeding, rather than for any legitimate purpose of the Commissioner. The second complaint was that the subpoenas sought records that were irrelevant, non-existent, or already in the Commissioner's possession.

Faced with this circumstance, the Commissioner petitioned the Circuit Court for an order compelling compliance with the subpoenas. Over appellant's objection, the unions were permitted to intervene in the Circuit Court action. After a non-evidentiary hearing, the court directed appellants to comply with the subpoenas, and this appeal followed.

We turn now to the issues, as we see them.

## I. Jurisdiction

There is an underlying question in this appeal, of jurisdictional dimension, that none of the parties has raised: Is an order enforcing an administrative subpoena, in an action brought solely for that purpose, a final judgment from which an appeal will lie under Md. Ann. Code, Courts article, § 12-301? The Maryland appellate courts have, in fact, entertained such appeals (see, for example, *Equitable Tr. v. State of Md. Comm'n,* 42 Md. App. 53, *rev'd* 280 Md. 80

(1980); but it does not appear that they have ever considered and discussed their jurisdiction to do so. It is, perhaps, time that the question be addressed and resolved.

Based largely upon clear pronouncements from the United States Supreme Court and a number of the Federal Courts of Appeals,[3] we conclude that the order before us is in the nature of a final, and thus appealable, order. The reason for this, as expressed by Mr. Justice Holmes in *Ellis v. Int. Com. Comm.,* 237 U.S. 434, 442 (1915), is that "[i]t is the end of a proceeding begun against the witness." In that proceeding, there is nothing further for the court to do, nothing further to be litigated.

## II. *Intervention in the Circuit Court Proceeding*

Intervention in judicial proceedings is governed by Maryland Rule 208. Section a thereof permits intervention as of right "when the representation of the appellant's interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action." Section b allows intervention, discretionarily, when the applicant's claim or defense "has a question of law or fact in common with the action."

Here, of course, the sole issue was whether appellants should be compelled to comply with the Commissioner's subpoenas. As noted, the subpoenas were issued at the request and on behalf of the unions, and the unions would be the principal beneficiaries of their fruits. In this circumstance, at the very least, their claim was in common with the Commissioner's action; and we therefore cannot conclude that the court abused its discretion in permitting

---

**3.** *See Ellis v. Int. Com. Comm.,* 237 U.S. 434 (1915); *Reisman v. Caplin,* 375 U.S. 440, 449 (1964); *O'Connor v. O'Connell,* 253 F.2d 365 (1st Cir. 1958); *United States v. McDonald,* 313 F.2d 832 (2d Cir. 1963); *FTC v. Texaco,* 517 F.2d 137 (D.C. Cir. 1975); *Sale v. United States,* 228 F.2d 682 (8th Cir. 1956), *cert. den.* 350 U.S. 1006; *cf. Cobbledick v. United States,* 309 U.S. 323 (1940); *Brown v. Braddick,* 595 F.2d 961 (5th Cir. 1979); *Natta v. Hogan,* 392 F.2d 686 (10th Cir. 1968); *Ochsner v. Millis,* 382 F.2d 618 (6th Cir. 1967). *But compare Thomas French & Sons v. International Braid Co.,* 146 F.2d 735 (1st Cir. 1945); *Shattuck v. Hoegl,* 523 F.2d 509 (2d Cir. 1975). *Also* 3 Mezines, Stein, Griff, *Administrative Law,* § 21.02[1].

intervention under section b. We need not, therefore, consider whether they had a *right* to intervene under section a.

### III. *Status of the Unions at the Administrative Proceeding*

Appellants do not challenge the Commissioner's authority to issue subpoenas of this type; that is specifically provided by § 101(c) of art. 100. The thrust of their complaint, aside from the breadth of the subpoenas, is that, in issuing them, the Commissioner was not acting on his own behalf but rather as a mere conduit for the unions, who had no legal standing in the proceeding. The records sought, they contend, were not needed or wanted as evidence by or for the Commissioner, but as evidence for other persons (the unions) who had no right to present evidence.

The Commissioner conceded at oral argument that he had indeed concluded his case prior to the unions' request, that he had no need or desire for the records sought by the unions, and that the subpoenas were issued solely at the request and for the benefit of the unions. Both he and the unions further conceded that, in that circumstance, the validity of the subpoenas *vel non* depends upon whether the unions were lawfully entitled to participate in the proceeding — whether, in other words, they were "interested persons." The real point of dispute between the parties, in this regard, is whether the unions qualify as "interested persons"; this is the core issue and therefore must be addressed and resolved by us.[4]

----

4. The unions suggest that the question of their intervention in the administrative proceeding is premature, and ought not be addressed in this appeal, because (1) the administrative proceeding is not over and (2) the Commissioner can countermand the decision of his hearing examiner. We find no merit in that argument. For one thing, it is the subpoenas that are primarily at issue here and it was the Commissioner (not the hearing examiner) who issued them and brought this proceeding to enforce them. Moreover, even were the Commissioner, at some future point, to decide that he (and his examiner) had acted in error, that would be of small comfort to appellants if, in obedience to the court order, they had already produced the records.

## A. *Definition* — *"Interested Person"*

Article 100, § 101 (c) permits "interested persons" to participate in compliance proceedings under the PWL, but does not define the term. Logically, then, in order to determine whether the unions were properly allowed to initiate these subpoenas, we must first define what the law means by "interested persons" and then see if, as to that type of proceeding, the unions qualify for that status.

In *Hyson v. Montgomery County,* 242 Md. 55, 69 (1966), a zoning case, the Court defined "interested persons" as "the same class of persons who can qualify as 'aggrieved persons' under our decisions relative to qualifications to be entitled to appeal," which would seem to require an "interest or right of property" in the pending matter. *See Pattison v. Corby,* 226 Md. 97, 101 (1961), also a zoning case.

The requirement of a "property" interest may be suitable to zoning proceedings, which peculiarly affect property; but it seems to be unduly restrictive, and we think unintended by the Court of Appeals, in the context of other types of administrative proceedings where "property" rights, in the classic sense, may not be involved. Analogous considerations would also suggest the inappropriateness of blindly applying the criteria precisely as set forth in Maryland Rule 208, governing intervention in *judicial* proceedings, although some aspects of those standards are not entirely inapposite.

From an amalgam of the concepts laid down in Maryland Rule 208, the few pronouncements in relevant judicial decisions, and what appears to be the manner in which courts have actually dealt with situations of this type, we would define an "interested person," for purposes of intervention in administrative proceedings of the sort involved here, as one who would be *directly* affected by the outcome of the proceeding in a different and more substantial way than would the public in general.[5] *See*

---

5. We are aware of a growing trend toward allowing intervention in administrative hearings by "public interest" organizations purporting to represent the public at large. *See* Davis, *Administrative Law of the Seventies,* § 8.11 (1976); *Minn. Public Interest v. Minn. Dept. of Labor,* 249 N.W.2d 437 (Minn. 1976). We express no opinion on that question, as the unions here have not claimed the status of "interested persons" by virtue of being public interest groups or as representatives of the public generally.

*Pattison v. Corby, supra,* at 101 and cases cited therein; *City of San Antonio v. C.A.B.,* 374 F.2d 326, 332 (D.C. Cir. 1967).

## B. *Statutory Framework*

Having defined the term, we now look to see whether the unions possess the requisite interest. This, of course, requires some understanding of the PWL itself — its purpose and the manner in which it is administered.

Prevailing wage laws, of one type or another, have been around for nearly 90 years, and are currently in effect in 41 States. Most of these enactments, particularly the later ones like Maryland's, were patterned after the Federal Davis-Bacon Act (Title 40, U.S.C., § 276a, *et seq.*), first passed by Congress in 1931; indeed, they are often referred to as "Little Davis-Bacon Acts." The original purpose of these laws — particularly Davis-Bacon — was to protect local contractors and workmen against what was deemed to be unfair and predatory competition from outsiders who, by importing cheap migratory labor, could obtain important public works contracts by underbidding contractors located in the community where the project was to be built. The direct effect of that type of competition, of course, was to place local contractors, having permanent ties to the community, at a competitive disadvantage and thus to deny employment on public projects to the "home town" workmen. An equally significant secondary effect was to destabilize wage rates generally prevailing in the locally based construction industry. In all these respects, such practices necessarily engendered a great deal of labor unrest. At a time when public projects dominated total construction spending, and unemployment in the construction industry was especially high, the need for remedial action by government was apparent; and both labor and industry initially supported this type of legislation, at least at the Federal level.[6]

---

6. The background and legislative history of the Davis-Bacon Act are set forth in Senate Report No. 1445, 71st Congress, 3d Session, Jan. 26, 1931. *See also* Davis-Bacon Legislation, Committee Print, Senate Committee on Banking, Housing, and Urban Affairs, 96th Congress, 1st Session, May 2,

Circumstances have, of course, changed since these earlier enactments, yet States, throughout the 1950's and 1960's continued to adopt these laws, even in light of the new and different economic conditions.[7] The common rationale of these statutes, including that of Maryland, seems to be one of wage stabilization — to assure that wage rates generally prevailing in the construction industry in particular areas are not adversely affected by major public works projects undertaken in those areas. By requiring contractors engaged in public construction to pay at least the same wage rates they would be expected to pay if engaged in non-public construction in the same community, the Legislature has endeavored to avoid unnecessary labor unrest that might especially affect public projects and delay their efficient completion. Viewpoints differ, of course, as to the efficacy and fairness of these laws,[8] but that does seem to be their asserted purpose and function.

Once a project is determined to be subject to PWL, there is, under the Maryland statute, a tripartite framework for achieving those goals, to wit: (1) requiring the Commissioner of Labor and Industry "to determine the prevailing rates of wages for workmen and apprentices for the class or type of work called for by the public works, in the

---

1979; Senate Report 963 on HR 6041, U.S. Code Congr. and Admve. News, 88th Congress, 2d Session (1964), p. 2340; *Legislative History of the Davis-Bacon Act,* Committee Print, House Committee on Education and Labor, 87th Congress, 2d Session, Sept., 1962; *International U. of Operating Eng., Local 627 v. Arthurs,* 355 F.Supp. 7 (W.D. Okla.) *aff'd* 480 F.2d 603 (10th Cir. 1973); *Prevailing Wage Determinations in the Construction Industry: Some Legal Aspects,* Wm. S. Tyson, 1952 Wisc. L. Rev. 440 (1952).

**7.** Eighteen States adopted these laws during the 1930's, three during the 1940's, five during the 1950's, eight during the 1960's, and one in 1973. Six States had adopted prevailing wage laws in or before 1914. Maryland first adopted a prevailing wage law in 1945 *(see* Laws of Md., 1945, ch. 999), but it applied only to road construction projects in Washington, Allegany, and Garrett Counties. *See* Md. Ann. Code art. 89B, § 25 (1964 Repl. Vol. and 1965 Supplement). The current law was enacted in 1969 (Laws of Md., 1969, ch. 558), and was substantially amended in 1970 (Laws of Md., 1970, ch. 293).

**8.** Significant efforts have been made in Congress to repeal the Davis-Bacon Act on the grounds that it is inflationary, cumbersome and has outlived its original purpose. *See Davis-Bacon Legislation, supra,* note 6; *also, Administration of the Davis-Bacon Act,* House Committee on Education and Labor, 87th Congress, 2d Session (1962).

locality the work is to be performed"; [9] (2) requiring the contractor on public works projects to pay its employees at least those determined prevailing rates by making them a part of the contract specifications; and (3) providing a post-determination mechanism for assuring compliance by the contractor.[10]

The first and third aspects of this process involve administration action; the second is virtually automatic.

The determination of what the prevailing rates are for each job classification is obviously a matter of extreme importance to both labor and management (not to mention the public, who ends up paying the cost of the project); and, because such determinations will have an influence generally throughout the construction industry, their interest extends beyond any particular public works project. In recognition of that pervading interest, the law requires that these groups, among others, have a reasonable opportunity to provide "input" into the Commissioner's determinations.

In making his initial determination, the Commissioner examines collective bargaining agreements, payroll data, and other information supplied by "contractors, contractors' associations, labor organizations, public officials, and other interested parties." COMAR 09.12.51.06B. Through this process, there is afforded an opportunity for pre-determination "input." Once the Commissioner makes his initial determination, he is required to give notice thereof "to any representative of any classification, any employer, or any representative of any group of employers who in writing requests the Commissioner so to do." Md. Ann. Code art. 100, § 98 (a).

Any of these persons or groups may, by verified petition,

---

9. Md. Ann. Code art. 100, § 98 (a).

10. One of the few areas of substantial difference among the various State and Federal prevailing wage laws concerns the enforcement mechanism. Some laws rely primarily on criminal sanctions, economic sanctions ("debarment" from further public contracts), or private enforcement actions in court by the employees allegedly being "short-changed"; others rely equally, or more, on administrative enforcement. Hereafter, we shall deal with the Maryland approach.

request a review of the determinations; and, upon such a petition, the Commissioner is required to institute an investigation and conduct a "public hearing." (§ 99(a)) He must give notice of this hearing "to the petitioner, the public body authorizing the public work, and the recognized collective bargaining representatives for the particular classifications involved, *and also to all persons entitled to receive notice pursuant to [§ 98(a)]. . . ."* (Emphasis supplied.) (*Id.*) At this hearing, the Commissioner offers the basis for his initial determinations and the results of his investigation. Thereafter, says § 99(a), "[t]he Commissioner *or any interested parties . . .* may introduce any evidence that is material to the issues." (Emphasis supplied.) There is no statutory right of further administrative or judicial review of the ultimate determinations.

Appellants concede that labor organizations representing workmen in the construction trades qualify as "interested parties" for purposes of proceedings under §§ 98 and 99 — *i.e.,* with respect to the *determination* of the prevailing wage rates. As to this, they agree, the unions have an obvious and direct interest; and the law clearly recognizes it by specifically including them among the groups entitled to notice and to file a review petition.

But with respect to *compliance* proceedings, they say, a labor organization is *not* an "interested person" and therefore has *no* right to participate *unless it represents the employees directly affected.* We agree.

Compliance and enforcement procedures are set forth in §§ 100-105 of art. 100. Section 100 (a) requires that notice of the prevailing hourly wage rates be continuously and conspicuously posted at the job site, in order that the workers themselves can police their employer. In addition, § 100 (d) requires the contractor to submit to the Commissioner a complete copy of its payroll records and those of each of its subcontractors. These records must be submitted within 14 days after the end of each payroll period, and are to "be available for inspection during regular business hours." *See* § 100 (d); *also* COMAR 09.12.51.01. The contractor is obliged to certify that the records are

accurate, including, among other things, a certification "that the classification set forth for each workman or apprentice conforms with the work he performed. . . ." § 100 (d).

Section 101 (a) empowers the Commissioner to cause investigations to be made to assure compliance with the law. He may do this on his own, and need not wait for a complaint. In part, this is done by having his staff audit the payroll records submitted to him, and compare them with the various classifications and wage rate determinations initially established for the job. If, upon completion of an investigation, the Commissioner determines that a violation may have occurred, he must (1) notify the public agency — the contracting authority — which is then required to withhold sufficient sums from the contractor to satisfy the deficiency, and (2) schedule a hearing. It is such a hearing that is at issue here.

Section 101 (c) directs the Commissioner to give notice of the hearing to "all interested persons, including the interested public body." At the hearing, "[e]very interested person shall have an opportunity to be heard in respect to the matters complained of. . . ." *Id.* Specifically, any "party of interest" may (1) "introduce testimony or other evidence in rebuttal or of an affirmative nature," (2) "directly or through his attorney make any statement or argument relevant to the hearing," and (3) through counsel, "be heard on any preliminary objections, exceptions, or motions. . . ." COMAR 09.12.51.05. The Commissioner, in conducting the investigation and hearing, is "deemed to be acting in a judicial capacity [11] and shall have the right to issue subpoenas, administer oaths, and examine witnesses."

Upon completion of the hearing, the Commissioner must determine the issues before him. If he finds a violation, the law provides several avenues for redress.[12]

---

11. We shall read this as "quasi-judicial capacity," as we do not believe that the General Assembly intended a violation of Article 8 of the Maryland Declaration of Rights (Separation of Powers).

12. Section 101 (d) directs the public agency to pay the workers directly from sums withheld from the contractor pursuant to § 101 (b). In addition, § 102 authorizes direct legal action by the workers against their employer

## C. *Discussion*

There is no doubt that the unions have an interest in seeing that the PWL is adequately enforced — that it is not circumvented either directly or by the more subtle type of activity alleged in this case. We accept even that their interest in aggressive enforcement is a shade above that of the general public. But that interest nevertheless remains a general and indirect one, quite different and far less substantial than would be involved if they represented any of the employees whose rights were allegedly violated.

The Commissioner and the unions, upon the premise that all parts of the statute should be read together, contend that whoever is entitled to notice of wage determinations under § 98 (a) would be an "interested party" under § 101 (c). There is no substance to that argument, however, either as a matter of statutory construction or as a matter of simple logic. Section 99 (a), in stating who is entitled to notice of wage determination hearings, specifically mentions "recognized collective bargaining representatives" for the classifications involved as well as "all persons entitled to receive notice pursuant to [§ 98 (a)]." Section 101 (c) contains no such reference, however, which, if anything, would indicate an intent contrary to the position espoused by appellees.

Moreover, such a construction could lead to absurd results because it ignores the very different nature of the two types of proceedings. Any employer who makes a written request is entitled to notice under § 98 (a); this is because "any employer" may wish to bid on the public contract and would therefore have a direct and substantial interest in the

---

to recover the underpayment. Section 98 (b) requires the contractor's bond to guarantee "the faithful performance of the prevailing hourly wage clause." Apart from these direct methods of enforcement, the law also imposes economic sanctions against noncomplying employers. Section 97 (b) provides for "liquidated damages" to the public agency at the rate of $10 a day for each employee underpaid. If the Commissioner finds that a contractor has "persistently and willfully" violated the law, he must notify the Secretary of State thereof and for one year thereafter the contractor is ineligible "from contracting directly or indirectly with any public body for the construction of any public works. . . ." *See* § 104 (c).

Commissioner's prevailing wage rate determinations. But that would not, it seems to us, give Employer A, who did not get the contract, or perhaps did not even bid on it, the right to intervene in a compliance proceeding involving his competitor, Employer B, who did get the contract. Yet that is precisely the result that would follow from this line of argument. If the unions are entitled to subpoena all of Barnes, Inc.'s records simply because they were entitled to notice under § 98(a), it would seem that all of Barnes, Inc.'s competitors would have the same right. We see no evidence that the statute was intended to be read in that manner.

To our knowledge, there is no decisional authority directly relevant to the issue before us. A number of courts around the country have considered a union's standing under prevailing wage laws, but valid distinctions of one type or another can be found in each of those cases.

The unions direct us to *Denver Bldg. & Const. Trades Council v. Vail,* 86 P.2d 267 (Colo. 1938), *El Paso Bldg. & Con. Tr. Council v. Texas Highway Com'n,* 231 S.W.2d 533 (Tex. Civ. App. 1950), and *International U. of Operating Eng., Local 627 v. Arthurs, supra,* 355 F. Supp. 7 (W.D. Okla.), *aff'd* 480 F.2d 603 (10th Cir. 1973), as supporting their claimed status as "interested persons"; however, none of those cases concerned enforcement proceedings against a particular contractor. Each case involved an attempt by a construction union or trade council to enjoin the letting of a public contract on the ground that the prevailing wage determinations included in the contract specifications were inaccurate. The dispute, in other words, related only to the propriety of the initial prevailing wage rate determinations; and as to that, there is no doubt of a union's status as an interested person. *See also Industrial Commission v. State Federation of Labor,* 110 P.2d 253 (Colo. 1941); *Carpenters Local No. 1650 v. City of Lexington,* 248 S.W.2d 407 (Ky. 1952).

Somewhat closer in point, though still distinguishable, are the cases rejecting attempts by non-representative unions either to enforce prevailing wage laws directly or to initiate enforcement proceedings under them.

In *Yerry v. Goodsell,* 166 N.Y.S.2d 224 (1957), *aff'd* 152 N.E.2d 535 (N.Y. 1958), certain construction unions filed a verified complaint with the Comptroller of the City of Kingston charging that the City school board was violating the New York PWL by using its regular maintenance employees to do reconstruction and repair work on public schools and paying them their regular salaries, which were less than the prevailing wage rates for the respective trades. The statute *required* the Comptroller to initiate an investigation upon verified complaint "of any person interested." None of the municipal employees involved were represented by the complaining unions, however; and, upon that basis, the Comptroller concluded that the unions were not "persons interested" and declined to make the investigation.

On appeal by the unions, the trial court and both appellate courts affirmed. As to the nature of the unions' interest in the matter, the intermediate court observed, 166 N.Y.S.2d at 228:

> "It was apparently the hope of the [unions] that, if the board were required to classify its employees and to pay the prevailing rate of wages for each class, the board would find it profitable to hire union craftsmen in place of the maintenance employees. That was the extent of the [unions'] interest in the matter. They do not claim to be acting for or on behalf of the employees on the job. On the contrary, it was their aim to have the civil service employees ousted from the work and to have them replaced by union members."

This was, of course, a direct and significant interest — one personal to the unions and their members, but it was *not,* said the Court, the type of interest contemplated by the New York statute. The compliance procedure set forth in that law "was not designed to provide a method of enforcing the prevailing rate of wages statute generally; it was adopted solely for the purpose of providing *the employees on the job*

with an effective administrative remedy." (Emphasis supplied.) 166 N.Y.S.2d at 229. The text of the statute, said the Court at p. 230, "makes it clear that only an employee or a person acting on his behalf is a 'person interested' entitled to file a complaint...."[13] *See also Empire State Chapter, Etc. v. Rome Hous. Auth.,* 339 N.Y.S.2d 847, 850 (1972).

In *International Brotherhood of Electrical Workers v. Board of Harbor Commissioners,* 68 C.A.3d 556 (Cal. App. 1977), a union sought a declaration that certain development operations being conducted by private companies on land owned by the City of Long Beach, pursuant to an agreement between the City and the companies, were subject to the prevailing wage law. It appears from the Court's Opinion that the union did not represent any of the employees on the job. Although the Court decided the case (by dismissing the action) on the ground that the development agreement was not a "public work," it also made clear that the union had no standing to enforce the prevailing wage requirement even if the project was a public work. At p. 563, the Court observed:

> "We recognize that the statute imposes a duty on the city and on the contractor to enforce the rights of the workmen, but the present suit is not one in which that duty may be enforced. Plaintiff sues only on behalf of its members — persons who, under the allegation of the complaint, are not persons employed at the less than prevailing wage...."

13. It is important to note that this conclusion was based upon a construction of the New York statute, which was somewhat different than the Maryland law. Under the New York procedure, the verified complaint triggered an investigation and hearing, and the product of that was a "determination" set forth in an order. If the determination was favorable to "the complainant," he "or any other person affected" could sue in court to recover the difference between the wage actually paid and that which should have been paid "as determined by said final order." Looking at this procedure as a continuum, the Court concluded that only a person entitled to sue at law for the wage deficiency qualified as a "person interested" entitled to file a verified complaint, and that this was limited to the employees directly involved or their representative.

A similar conclusion was reached by the Wisconsin Court in *Chauffeurs, Etc., Local No. 200 v. Wis. Emp. Rel. Comm.,* 187 N.W.2d 364 (Wisc. 1971). The State Highway Commission contracted with a wrecking company (Gerovac) to do work on a State highway. A union, representing none of Gerovac's employees, picketed the site and filed an unfair labor practice charge with the State Employment Relations Commission, alleging that Gerovac was paying less than the prevailing wage rates. Violation of the Wisconsin PWL constituted a misdemeanor, and the basis of the unfair labor practice charge was that Gerovac was committing a misdemeanor "in connection with any controversy as to employment relations."

Wisconsin did not, at that time at least, provide an administrative enforcement mechanism in its PWL, as does Maryland. Rather, it sought to assure compliance through criminal sanctions and private court actions by directly affected employees. Because the complaining union did not represent any of these employees, however, it was held to have no standing to enforce the PWL. In reaching this conclusion, the Court acknowledged the union's "interest in Gerovac's employment practices" as well as its concern with "effectuating the purpose of the prevailing wage law" (*see* 187 N.W.2d at 369 and 370); but, given the other enforcement mechanisms provided by the PWL, it agreed with the Employment Relations Commission that the union was simply not a "party in interest."

Appellees seek to distinguish these cases on the basis that they all involved attempts at direct enforcement action rather than mere participation in a proceeding brought by the public official primarily charged with enforcement. That distinction does not exist, however, under the facts of this case. Given the concessions noted, what is before us, quite plainly, is an attempt by the unions to enforce the PWL on their own, collaterally to the efforts made by the Commissioner. But in making that effort, the unions were not acting on behalf of the employees directly affected by the proceeding. To them, the unions were legal and economic

strangers; and for that reason, the general rationale applied in these cases would appear to be applicable.

Our conclusion, however, is not based upon this somewhat tenuous line of out-of-State cases, but rather upon our analysis of the Maryland statute. We do see a significant difference between wage rate determination proceedings under §§ 98 and 99 and specific compliance proceedings under § 101 (c). The former, as noted, has broad economic implications for many different groups and entities; the latter is for the particular benefit of the employees directly affected — those allegedly being paid less than the law requires. The sole purpose of a § 101 (c) proceeding is to secure *to those employees working on the public project* the wages to which they are entitled.

In this regard, there is another distinction to be drawn. When a union actually represents the employees involved, its interest in a compliance proceeding is primarily a derivative one; it is the *employees'* interest being represented and asserted, not that of the union itself. The union thus assumes, vicariously, the status of the employees themselves; that is what would make it, under that circumstance, an "interested person." This, of course, is not true where the union does not represent the affected employees. In that instance, the interest being asserted by the union is purely a personal one of its own. That interest may or may not be consistent with the interest of the employees on the job, depending upon the overall circumstances of the case; but regardless, the union, in that situation, is a complete stranger to the parties, to the transaction, and to the object of the proceeding.

For these reasons, we find that the Commissioner and the Circuit Court erred in deeming the unions to be "interested persons" in the administrative proceeding. They had no right to participate in the proceeding, no right to initiate the subpoenas, and no right to the records sought by the subpoenas. Accordingly, under the facts before us, we conclude that the subpoenas were improperly issued and for

that reason are invalid. In light of this conclusion, we need not address the question of overbreadth.

> *Order reversed; case remanded to Circuit Court for Baltimore County for entry of order dismissing petition to enforce subpoenas; appellees to pay the costs.*