992 A.2d 459

**120 WEST FAYETTE STREET, LLLP**

v.

**MAYOR & CITY COUNCIL OF BALTIMORE CITY,**
Baltimore Development Corp. and Lexington
Square Partnership, LLC.

No. 96 Sept.Term, 2009.

Court of Appeals of Maryland.

April 13, 2010.

M. Albert Figinski (Paul D. Raschke and Joyce R. Lombardi of Law Offices of Peter G. Angelos, P.C., Baltimore, MD), on brief for Appellant.

David E. Ralph (George A. Nilson and Steven J. Potter of Baltimore City Dept. of Law, Baltimore, MD), on brief; Brian L. Moffet (Catherine A. Bledsoe of Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC; Charles S. Hirsch and

Mark Pollak of Ballard Spahr Andrews & Ingersoll, LLP, Baltimore, MD), on brief for Appellees.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BARBERA, Judge.

In this appeal, we consider for the second time the controversy between 120 West Fayette Street, LLLP ("120 West Fayette") and the Mayor and City Council for Baltimore City et al. ("the City"), in which 120 West Fayette alleges that the City illegally entered into a Land Disposition Agreement ("LDA") to sell to Lexington Square Partners, LLC property in Baltimore's westside known as the "Superblock." When we first considered this case in *120 West Fayette Street, LLLP v. Baltimore*, 407 Md. 253, 964 A.2d 662 (2009), we held that 120 West Fayette had standing to challenge the LDA and that the Circuit Court for Baltimore City had erred in treating the City's motion to dismiss as a motion for summary judgment. *Id.* at 258, 964 A.2d at 664–65. This case's current incarnation arises in response to the Circuit Court's grant of summary judgment in the City's favor on 120 West Fayette's original complaint and that court's grant of the City's motion to dismiss Count Two of 120 West Fayette's amended complaint. For the foregoing reasons, we shall affirm the judgment of the Circuit Court.

I.

"In 1999, the Baltimore City Council enacted an urban renewal plan[1] for the westside of downtown Baltimore. The

---

1. The Baltimore City Code defines an "urban renewal plan" as a plan "for the elimination, correction, or the prevention of the development or the spread of slums, blight, or deterioration in an entire Renewal Area or a portion thereof." Art. 13 ("Housing and Urban Renewal"), § 2.5(b)(1). A "Renewal Area" is defined as an "area within the boundary lines of the City of Baltimore which may be benefitted through the exercise of functions and powers vested in the Department

renewal plan, known as the 'Market Center Urban Renewal Plan,' ["the Renewal Plan"] has been advertised as Baltimore's largest urban renewal plan since the plan to revitalize the city's Inner Harbor." *Id.* at 258–59, 964 A.2d at 665. At issue in this case is an area within the westside redevelopment area known as the "Superblock." "The 'Superblock' encompasses five blocks and is bound by Fayette Street, Howard Street, Lexington Street, Clay Street, and Park Avenue."[2] *Id.* at 259, 964 A.2d at 665.

"To implement [the Renewal Plan], the Baltimore Board of Estimates ("BOE") delegated 'ministerial and administrative' functions to a nonprofit corporation known as the Baltimore Development Corporation, Inc. ("BDC")." *Id.* at 258–59, 964 A.2d at 665. The BDC is a not-for-profit corporation created, among other reasons, "[t]o develop and implement long-range development strategies for commercial, industrial, office, residential, and other development in the City of Baltimore[.]" *Baltimore Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 309, 910 A.2d 406, 411 (2006) (quoting Amended Articles of Incorporation of the City of Baltimore Development Corporation, ART. FOURTH, October 4, 1991). The BDC is governed by a board of directors comprising "not less than seven (7), nor more than fifteen (15) directors," including the Commissioner of the City's Department of Housing and Community Development and the Director of the City's Department of Finance. *Id.* at 325 n. 17, 910 A.2d at 421–22 n. 17 (quoting SECTION 1 of the BDC's bylaws as amended on November 4,

of Housing and Community Development...." Baltimore City Code, Art. 13, § 2.4(a)(1).

*120 West Fayette St.*, 407 Md. at 258–59, 964 A.2d at 665.

2. 120 West Fayette stresses that until the Baltimore Development Corporation submitted the LDA to the City Board of Estimates for approval on December 14, 2006, the proposed development area had excluded a 1/2–acre site near the 200 block of West Fayette Street where the Greyhound bus terminal previously was located. At the time the RFP was issued, the Weinberg Foundation owned the lot and planned to develop a parking garage at the site. Before the conclusion of the negotiations over the proposed LDA, however, the Weinberg Foundation abandoned its plan to develop the site and, thus, it was included in the proposed development area of the "Superblock."

1997). Those directors not named in the bylaws, including the chairman of the board, are nominated by the Mayor of the City and elected by the corporation's members. *Id.*, 910 A.2d at 421 n. 17. The Mayor also has the authority to remove directors and fill vacancies on the board until the expiration of the absent director's term. *Id.*, 910 A.2d at 422 n. 17.

In *Carmel Realty*, we recognized that the Mayor, by virtue of the above-mentioned authority, effectively controls the BDC's board of directors. *Id.* at 326, 910 A.2d at 422. In this case, the BDC's relevant responsibility was to orchestrate the development and revitalization of the City-owned properties subject to the Renewal Plan, including the "Superblock." To that end, "[t]he City asserts that it instructed the BDC to 'work with developers and interested groups regarding the development of the westside, prepare and issue requests for development proposals, arrange and attend meetings between developers and business owners, and coordinate financial assistance.'" *120 West Fayette St.*, 407 Md. at 259, 964 A.2d at 665.

On October 27, 2003, the BDC issued a Request for Proposals ("RFP") soliciting proposals from experienced real estate developers to develop the "Superblock." The RFP provided that the BDC, on behalf of the City, was "seeking developers who [were] willing and able to develop [the "Superblock"] . . . in accordance with revitalization objectives and goals as stated [in the RFP], as well as the rules and regulations for standards and controls established by the Mayor and City Council . . . and implemented by the BDC." In addition to other rules and regulations, the City's efforts to redevelop the "Superblock" are subject to a Memorandum of Agreement ("MOA") between the Mayor and City Council of Baltimore City, and the Maryland Historical Trust ("MHT"). Among other things, the MOA provides that in all City-issued RFPs "the City will use reasonable efforts" to preserve certain City-owned or acquired historic properties within the relevant development area.

Accordingly, the RFP provided, in part, that the proposed "[d]evelopment should conform to the Memorandum of Agreement (MOA) executed between the City and the Maryland Historic[al] Trust ... and The West Side Strategic Plan." The RFP also provided that the selected developers would receive an Exclusive Negotiating Privilege ("ENP"), which guaranteed them the exclusive privilege of negotiating a Land Disposition Agreement ("LDA") with the City.[3] During the ENP's term, the privileged developers would be granted an opportunity to enter the property and conduct any activities necessary to satisfy the City's requirements within the ENP. After the expiration of the term, the City could extend the time period if negotiations were "proceeding satisfactorily."

In response to the RFP, the BDC received proposals from four competitive development teams and responded to each of those development teams with written questions. Additionally, each development team presented its proposal to BDC staff and members of the WestSide Renaissance and the MHT.[4] Among the prospective development teams was Next Genera-

---

**3.** ENP agreements are tools commonly employed in development projects to allow the potential developer to gather the information necessary to finalize project plans and obtain financing. *See, e.g., Save Tara v. City of West Hollywood,* 45 Cal.4th 116, 84 Cal.Rptr.3d 614, 194 P.3d 344, 359 (2008) ("Such preliminary or tentative agreements may be needed in order for the project proponent to gather financial resources for environmental and technical studies, to seek needed grants or permits from other government agencies, or to test interest among prospective commercial tenants."); *Vigoda v. Denver Urban Renewal Auth.,* 646 P.2d 900, 902 (Colo.1982) (en banc) (discussing an urban renewal authority's request for development proposals involving the use of exclusive negotiation privilege prior to awarding the final contract); *Johnson v. City of Minneapolis,* 667 N.W.2d 109, 111 (Minn.2003) (noting that the city granted the potential developer exclusive negotiating rights prior to awarding the development contract); *Goodstein Constr. Corp. v. New York,* 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356, 1357 (1992) ("This action for damages against the City of New York arises from the termination of plaintiff's exclusive right to negotiate the terms and conditions of a contemplated land disposition agreement (LDA)[.]").

**4.** The WestSide Renaissance is a non-profit corporation comprised of various public and private institutions that are stakeholders in the revitalization of Baltimore's westside.

tion Chera, LLC ("Next Generation"), with which the Mayor, members of the BDC, and members of the WestSide Renaissance met prior to awarding an ENP, on June 24, 2005, to Lexington Square Partners, LLC ("Lexington Square"), an affiliate of Next Generation.[5] The ENP lists the signatories as the Mayor and City Council of Baltimore, on whose behalf the president of the BDC signed; Lexington Square, represented by its managing member's signature; and the City's Chief Solicitor, who signed on his own behalf.

The ENP provided for a one-year negotiations period with an option to extend for six months, required Lexington Square to "comply in all material respects" with the MOA, and specified that the ultimate disposition of the property would be governed by the terms of an LDA subject to the approval of the BOE. The ENP did not guarantee that the BOE would approve an LDA with Lexington Square. After the one-year term expired, Lexington Square exercised the six-month extension. After that term expired, in a letter dated December 14, 2006, the BDC recommended to the BOE that the City enter into an LDA with Lexington Square. At a public meeting on January 10, 2007, the BOE approved and authorized the execution of the LDA with Lexington Square. In November 2007, the BOE approved an amendment of the LDA to reflect changes in the property being transferred.

Under the LDA, Lexington Square will receive upon closing a fee simple interest in all property conveyed pursuant to the agreement. Closing on the property is contingent on several conditions, including the City's acquisition of any unowned property to be conveyed under the agreement, the "resolution of any legal and administrative challenges," the MHT's approval of the project plan, and sufficient evidence that Lexington Square has financing for the project. In the event that the closing does not occur by December 31, 2010, the LDA

---

**5.** Lexington Square consists of Next Generation, which submitted the original proposal in response to the RFP, HAD Baltimore, II, LLC, and Nakash–Lexington, LLC. The latter two entities were added to the development team after Next Generation responded to the RFP.

provides that as long as the developer has not defaulted on the agreement, it will terminate automatically without liability or obligation to either party. Similarly, if the parties are unable to agree on a final project plan, the developer may terminate the agreement.[6] In the event that Lexington Square defaults on the terms of the LDA, it provides that the City will have a right of re-entry. The LDA also provides that Lexington Square will be reimbursed for its costs plus ten percent interest upon the City's default.

### The Lawsuit

On February 27, 2007, 120 West Fayette filed, as a taxpayer and landowner, a declaratory judgment action against the City to challenge the validity of the Lexington Square LDA. 120 West Fayette argued that "the City, and its agent, the BDC, unlawfully violated and manipulated the RFP process, in violation of the City's Charter and laws, to award the LDA to a favored developer." *120 West Fayette St.*, 407 Md. at 260, 964 A.2d at 665. Accordingly, 120 West Fayette sought a declaratory judgment finding that the LDA awarded to Lexington Square was illegal and *ultra vires*. On April 30, 2007, the City filed a motion to dismiss the complaint, and on January 18, 2008, the Circuit Court issued a memorandum opinion and order granting the City's motion to dismiss on the basis that 120 West Fayette did not have standing to bring the suit and that

> 1) There is no expenditure of public funds in connection with the development of the Superblock, 2) the Defendant City acted according to the City's Code in authorizing the BDC to act on its behalf, 3) the Superblock is not a public work subject to the competitive bidding process outlined in the City's Charter, and 4) the Defendant City did not engage in any illegal or *ultra vires* acts in the LDA or ENP.

---

**6.** The developer also has a yet unexercised right to terminate the agreement triggered when closing did not occur prior to December 31, 2009.

*120 West Fayette St.*, 407 Md. at 260, 964 A.2d at 666 (internal quotation marks omitted).

120 West Fayette timely appealed to the Court of Special Appeals, but this Court issued a writ of certiorari on its own motion before the intermediate appellate court considered the case. *120 West Fayette v. Baltimore*, 405 Md. 290, 950 A.2d 828 (2008). As previously mentioned, we held in *120 West Fayette Street* that the Circuit Court had erred in granting the City's motion to dismiss because it relied on factual and documentary matters outside of the pleadings in reaching its conclusion and effectively converted the City's motion into a motion for summary judgment without allowing 120 West Fayette the requisite opportunity to engage in discovery. 407 Md. at 262–65, 964 A.2d at 666–68. We also held that 120 West Fayette had alleged sufficient facts to establish taxpayer standing, as well as property owner standing. *Id.* at 269, 273, 964 A.2d at 671, 673. Therefore, we reversed the Circuit Court's judgment and remanded the case to that court for further proceedings. *Id.* at 274, 964 A.2d at 674.

Upon remand to the Circuit Court, the City filed a motion for summary judgment on April 13, 2009. On April 29, 2009, 120 West Fayette filed an opposition to the City's motion and on June 17, 2009, filed an amended complaint effectively alleging in Count Two that the proposed plans for the "Super-block" had not been approved by the MHT and violated certain provisions of the Renewal Plan as well as the MOA. Therefore, 120 West Fayette sought declaratory relief declaring the applicability to the "Superblock" of the MOA and the Renewal Plan development standards. On July 1, 2009, the City filed a "Motion to Dismiss or for Summary Judgment as to Count Two" and a request for a hearing. On July 8, 2009, 120 West Fayette filed an interim response to the City's motion and on July 21, 2009, filed an opposition to the motion. Because the City's second motion "was not yet ripe for judicial review," the Circuit Court held no hearing on the motion and issued an order and memorandum opinion on both motions on August 14, 2009.

The Circuit Court considered 120 West Fayette's contention that the City's disposition of the "Superblock" was subject to the competitive bidding requirements of the Baltimore City Charter ("the Charter"). The court found that "the statutory language in the Baltimore City Code, Baltimore City Charter, and Maryland Constitution clearly grants plenary authority to the City to dispose of the property for development or redevelopment without any mention of the requirement for competitive bidding." Accordingly, the court determined that the City was not required to use competitive bidding for development or redevelopment initiatives.

The court then addressed whether the "Superblock" LDA was a public work project subject to competitive bidding requirements under Article IV, § 11 of the Charter. The court determined that the LDA was not a public work because it contemplated development on the developer's private land for the developer's private use.[7] Moreover, the court rejected

---

7. Unless otherwise noted, all subsequent references to Article VI, § 11, which applies to the BOE and is entitled "Procurement," are to the Baltimore City Charter. Article VI, § 11, in relevant part, provides:

(a) *Board of Estimates responsible.*
The Board of Estimates shall be responsible for awarding contracts and supervising all purchasing by the City as provided in this section and elsewhere in the Charter.

(b) *Contracts of $25,000 or more.*
(i) In contracting for any public work, or the purchase of any supplies (unless otherwise provided by ordinance for foodstuffs and related perishables), materials, equipment, or services other than professional services, involving an expenditure of twenty-five thousand dollars or more, for the City or by any municipal agency, advertisements for proposals shall first be published at least twice in two or more daily newspapers published in Baltimore City unless otherwise provided by the Charter. The first publication shall be made not less than ten nor more than ninety days prior to the day set for opening the bids.
* * *

(iii) The contract for any public work or the purchase of any supplies (unless otherwise provided by ordinance for foodstuffs and related perishables), materials, equipment, or services other than professional services, involving an expenditure of five thousand dollars or more shall be made by the Board of Estimates in the manner provided in subsection (g).
* * *

120 West Fayette's suggestion that the RFP initiated a competitive bidding process subject to the Article VI, § 11 procurement laws. Noting that the City would not own or operate the property developed under the RFP and would have minimal ongoing control over any development, the court found that the City had not intended the RFP to initiate a competitive bidding process and, therefore, that the City was not bound by the § 11 procurement laws when considering proposals to develop the "Superblock."

Additionally, the court considered whether the City had impermissibly delegated urban renewal powers to the BDC and found that, under Baltimore City Code, Article 13, § 2-7, the City Department of Housing and Community Development ("DHCD") has the authority to contract with the BDC for urban renewal consulting services.[8] Further, the court

---

(g) *Bid awards.*

(1)(i) All bids made to the City in response to the formal advertising procedures contained in this section, for materials, supplies, equipment, services, or public works, or for any other purpose, unless otherwise provided in the Charter, shall be opened by the Board of Estimates.

\* \* \*

(v) Any recommendation that is made by any municipal agency to the Board of Estimates as to the appropriate award to be made by the Board is advisory only and not binding on the Board.

8. Unless otherwise noted, all subsequent references to Article 13, § 2-7, entitled "Specific Powers," refer to Subtitle 2 "Department of Housing and Community Development" of the City Code. Article 13, § 2-7, in relevant part, provides:

(a) *In general.*

(1) The Department of Housing and Community Development shall have and exercise, except as otherwise provided herein, all the powers set forth in Article II, § (15) of the Charter of Baltimore City (1964 revision) and all of the powers of the Mayor and the City Council of Baltimore necessary or convenient, from time to time, to carry out and effectuate any and all of the functions and purposes mentioned in this ordinance {*subtitle*}, except such powers as are required by the City Charter or the laws of the State of Maryland to be exercised exclusively by any other officer, department, bureau, or agency of the City.

(2) In addition to other powers herein granted, such powers shall include but shall not be limited to the following.

(b) *Property acquisition for development, etc.*

(1) {*The power to:*}

(i) acquire, for and on behalf of the Mayor and City Council of Baltimore, within areas of operation, and in accordance with applicable Renewal Plans and Conservation Plans, land and property of every kind, and any right, interest, franchise, easement or privilege therein, including land or property and any right or interest therein already devoted to public use, by purchase, lease, gift, condemnation, or any other legal means for development or redevelopment, including but not limited to the renovation or rehabilitation thereof;

(ii) negotiate and contract for the acquisition of such land and property or any right, interest, franchise, easement, or privilege therein; and

\* \* \*

(d) *Development or redevelopment.*

In accordance with applicable Renewal Plans or Conservation Plans, to develop or redevelop, including but not limited to renovation or rehabilitation, any and all land or property acquired by any of the methods hereinbefore mentioned.

\* \* \*

(f) *Disposing of property.*

(1) In accordance with applicable Renewal Plans or Conservation Plans, to sell at public or private sale, lease, convey, transfer, or otherwise dispose of any land or property, or any interest in them, acquired by it regardless of whether or not it has been developed, redeveloped, altered, or improved and irrespective of the manner or means in or by which it may have been acquired to the United States of America, the Housing Authority of Baltimore City, the State of Maryland, or any department or agency of them, or to any private, public, or quasi-public corporation, partnership, association, person, or other legal entity, for conservation, development, or redevelopment, including but not limited to renovation or rehabilitation.

(2) Provided, however, that all contracts for the sale, lease, conveyance, transfer, or other disposition of any said land or property or for the transfer of any other interest therein shall be executed in the name of the Mayor and City Council of Baltimore and shall require the approval of the Board of Estimates prior to execution as the legal and financial ability of the contracting parties.

(3) Such contracts shall provide for the sale, lease, conveyance, transfer, or other disposition of land or property or any interest therein at such prices and on such terms as may be appropriate to the uses prescribed for such land or property by the applicable Renewal Plan or Conservation Plan and the restrictions upon, and the covenants, conditions, and obligations assumed by the purchaser, transferee, or lessee.

\* \* \*

(n) *Professional services—contracting for.*

Subject to the prior approval of the Board of Estimates, to contract, from time to time, with any private, public, or quasi-public corporation, partnership, association, person, or other legal entity for the furnishing of consulting, planning, designing, engineering, or other

determined that the BDC's recommendation of a developer to the BOE was an advisory act properly vested in the BDC and that the ultimate decision-making authority had remained with the BOE. Accordingly, the court found that the City was entitled to judgment as a matter of law on the original complaint. As to Count Two of 120 West Fayette's amended complaint, the Circuit Court found that the facts as alleged did not present a controversy ripe for judicial consideration because the City has not yet adopted plans for the "Superblock."

On September 10, 2009, 120 West Fayette timely noted an appeal to the Court of Special Appeals, and on September 11, 2009, filed with this Court a petition for writ of certiorari, seeking to bypass review by the Court of Special Appeals. On September 15, 2009, the City filed an answer and cross-petition for writ of certiorari. On September 16, 2009, 120 West Fayette filed an "Emergency Motion for Expedited Review," seeking expedited consideration of its petition and the City's cross-petition. On September 28, 2009, we granted 120 West Fayette's motion and certiorari on both petitions, *120 West Fayette St., LLLP v. Baltimore*, 410 Md. 701, 980 A.2d 482 (2009).

The petition and cross-petition presented five questions for our consideration.[9] To answer these questions, however, we

technical or specialized services in connection with the duties, powers, and functions of the Department of Housing and Community Development.
(*o*) *Professional services—employment of.*
Subject to the prior approval of the Board of Estimates, to employ or hire, from time to time, by contract, consulting, planning, or designing engineers or other persons possessing technical or specialized skills in connection with the duties, powers, and functions of the Department of Housing and Community Development.

9. The petition and cross-petition presented the following five questions:
 1. Was the challenged Land Disposition Agreement (LDA) more than a 'mere sale of land,' in derogation of the City Charter requirements for competitive bidding, and further, *ultra vires* because ceremonial approval, without any chance for alternatives, for the LDA was all that remained for the Board of Estimates, after nearly 40 months of secret manipulation by [the] BDC, in violation of the City Charter and the Express Powers Doctrine?

need only address (1) whether the Circuit Court properly found that the LDA was not subject to competitive bidding requirements, (2) whether the Circuit Court properly determined that the City's delegation of authority to the BDC was lawful and therefore that the LDA was not an *ultra vires* act, and (3) whether the Circuit Court correctly concluded that it could not issue a declaratory judgment that the proposed plans for the "Superblock" are subject to the MOA and the Renewal Plan development standards because the controversy was not ripe for judicial consideration. For the following reasons, we shall affirm the judgment of the Circuit Court.

## II.

Before considering the questions of law, we must "make the threshold determination as to whether a genuine dispute of material fact exists, and only where such dispute is

---

2. Whether the Circuit Court improperly denied, on ripeness grounds, a declaration of rights on a) the overriding control of the 2001 memorandum of agreement (MOA) between the City of Baltimore and the State of Maryland on Superblock revitalization, and b) height restrictions on new construction in any westside revitalization?

3. In granting summary judgment, did the Circuit Court err by refusing to resolve all facts and inferences against movant Respondents, and, indeed, by recognizing only the 'facts' presented by Respondents?

[4.] Did the Circuit Court properly hold that the Land Disposition Agreement is not a contract for public works subject to competitive bidding under Article VI, Section 11 of the Baltimore City Charter where the agreement involves the sale of land, not the procurement of goods and services, and the subsequent redevelopment will be conducted by Lexington Square, at Lexington Square's expense, on Lexington Square-owned property?

[5.] Did the Circuit Court correctly hold that the City lawfully delegated to the BDC the administrative tasks of issuing a request for proposals for the Superblock redevelopment, reviewing the proposals, making recommendations as to which developers should be granted exclusive negotiating privileges, and working with the developer selected by the City to formulate a proposed Land Disposition Agreement, where the City provided adequate guidelines for the BDC's performance of those duties and retained for itself the final decision-making authority, which it properly exercised when the Board of Estimates reviewed and approved the Land Disposition Agreement with Lexington Square?

absent will we proceed to review determinations of law." *O'Connor v. Baltimore County,* 382 Md. 102, 110, 854 A.2d 1191, 1196 (2004) (internal quotation marks and citations omitted). A trial court may grant summary judgment "when there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law." *120 West Fayette St.,* 407 Md. at 264, 964 A.2d at 668. Whether a trial court properly applied this standard is a question of law, which we review *de novo. Rhoads v. Sommer,* 401 Md. 131, 148, 931 A.2d 508, 517–18 (2007). To determine whether any genuine dispute of material fact precludes the grant of summary judgment, we review the record in the light most favorable to the non-moving party, construing against the moving party any reasonable inferences that may be drawn from the facts. *Id.,* 931 A.2d at 518.

120 West Fayette argues that the Circuit Court erred by construing disputed facts in favor of the City. We agree, however, with the Circuit Court's determination that no dispute of material fact exists. 120 West Fayette and the City agree that the BDC issued an RFP on October 27, 2003, that the City received four viable proposals in response to the RFP, and that the proposals were presented to the BDC staff, the WestSide Renaissance, and the MHT. Moreover, the parties agree that, although the initial RFP did not include the former Greyhound Terminal, the ultimate LDA included the terminal as part of the property to be conveyed. Notably, 120 West Fayette argues that the Circuit Court erred by accepting the City's assertion that the ultimate authority to approve the LDA was vested in the BOE. Yet, the record demonstrates that the BDC recommended that the BOE award the LDA to Lexington Square, and the BOE approved the LDA on January 10, 2007, at a public meeting. None of the facts in the record indicates that an entity other than the BOE had final approval of the LDA or that the BOE could not have refused to approve the LDA. The City does not contest 120 West Fayette's version of the facts, but rather the legal effect of them. Accordingly, we shall now address whether the City was entitled to judgment as a matter of law.

### III.

■ First, we consider whether all City urban renewal projects are subject to the competitive bidding requirements established in Article VI, § 11, regardless of whether those projects constitute public works. 120 West Fayette contends that, contrary to the Circuit Court's finding, urban renewal projects are not exempt from the Charter's competitive bidding requirements because the Charter does not explicitly exempt such projects from the requirements and applying the requirements is consistent with the statutory scheme. The City counters that none of the Charter or Code provisions relating to the disposition of land for development or redevelopment requires competitive bidding and that the Circuit Court correctly found that the LDA was not subject to competitive bidding requirements. In support, the City points to Article II, § 15 of the Charter, which establishes the City's authority to engage in land development and redevelopment through property sales, and Article 13, § 2–7(f)(1), which allows the DHCD, on behalf of the City, to dispose of property for redevelopment "at public or private sale." [10] Moreover, the City contends that the only caveats on the City's authority to dispose of the property are that the prices and terms of the sale be "appropriate to the uses prescribed for such land or property by the applicable Renewal Plan," and that the BOE approves the contract. Art. 13, § 2–7(f)(2), (f)(3). The City also points out that Article VI, § 11 is entitled "Board of Estimates-procurement" and therefore is intended to apply to City purchases of goods and services and the construction of City buildings, not the sale of land for redevelopment.

---

**10.** Unless otherwise noted, all references to Article II, § 15, entitled "Land development and redevelopment," are to the Baltimore City Charter. Article II § 15(c) provides that the Mayor and City Council of Baltimore have the authority "[t]o sell, lease, convey, transfer or otherwise dispose of any of said land or property, regardless of whether or not it has been developed, redeveloped, altered or improved and irrespective of the manner or means in or by which it may have been acquired . . . for development or redevelopment[.]"

We construe local ordinances and charters under the same canons of statutory construction as we apply to statutes. *O'Connor,* 382 Md. at 113, 854 A.2d at 1198. "The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature." *Kushell v. Dep't of Natural Res.,* 385 Md. 563, 576, 870 A.2d 186, 193 (2005) (citing *Collins v. State,* 383 Md. 684, 688, 861 A.2d 727, 730 (2004)). In ascertaining legislative intent, "we assign the words their ordinary and natural meaning" and avoid adding or deleting words to impose a meaning inconsistent with the plain language of the ordinance or charter. *O'Connor,* 382 Md. at 113–14, 854 A.2d at 1198. Moreover, "a court must read the language of the charter or ordinance in context and in relation to all of its provisions[.]" *Howard Research Dev. Corp. v. Concerned Citizens for the Columbia Concept,* 297 Md. 357, 364, 466 A.2d 31, 34 (1983). Therefore, when two provisions "relate to the same subject matter, and are not inconsistent with each other, they should be construed together and harmonized where consistent with their general object and scope." *Md.–Nat'l Capital Park & Planning Comm'n v. Anderson,* 395 Md. 172, 183, 909 A.2d 694, 700 (2006) (internal quotation marks and citations omitted). Likewise, "when two statutes appear to apply to the same situation, this Court will attempt to give effect to both statutes to the extent that they are reconcilable." *Id.,* 909 A.2d at 700 (internal quotation marks and citations omitted).

Whether Article II, § 15 and Article 13, § 2–7 must be construed *in pari materia* with Article VI, § 11 turns on whether these sections relate to the same subject matter or apply to the same situation and are not inconsistent with one another.[11] *See id.,* 909 A.2d at 700. Article II, § 15 and

---

11. Section 2–7(f), authorizes the DHCD to dispose of property on behalf of the City and provides in relevant part:

(1) In accordance with applicable Renewal Plans or Conservation Plans, to sell at public or private sale, lease, convey, transfer, or otherwise dispose of any land or property, or any interest in them, acquired by it regardless of whether or not it has been developed, redeveloped, altered, or improved and irrespective of the manner

Article 13, § 2–7 address the City's authority to acquire property and to sell or dispose of property. Article VI, § 11(a) provides that the BOE "shall be responsible for awarding all contracts and supervising all purchasing by the City as provided in this section and elsewhere in the Charter." Because the acquisition or sale of property typically involves a contract of some sort, in this sense, these provisions relate to the same subject matter. Our efforts to reconcile Article VI, § 11 with the other provisions, however, must not result in an illogical or unreasonable interpretation. When construing a statute, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106, 112 (1994).

 When contracting for public works,[12] Article VI, § 11(b) requires the City to obtain bids through a competitive bidding process, and § 11(g)(1) of that same article mandates that the BOE accept the lowest bid submitted in response to the City's request for bids.[13] We have recognized that, gener-

---

or means in or by which it may have been acquired ... for conservation, development, or redevelopment, including but not limited to renovation or rehabilitation.

(2) Provided, however, that all contracts for the sale, lease, conveyance, transfer, or other disposition of any of said land or property or for the transfer of any other interest therein shall be executed in the name of the Mayor and City Council of Baltimore and shall require the approval of the Board of Estimates prior to execution as to the legal and financial ability of the contracting parties.

(3) Such contracts shall provide for the sale, lease, conveyance, transfer, or other disposition of land or property or any interest therein at such prices and on such terms as may be appropriate to the uses prescribed for such land or property by the applicable Renewal Plan or Conservation Plan and the restrictions upon, and the covenants, conditions, and obligations assumed by the purchaser, transferee, or lessee.

12. We have not yet determined whether the LDA at issue in this case is a public work contract. At this point, we are merely determining whether the competitive bidding requirements established in Article VI, § 11 may be reconciled with the City's authority to contract for the sale of property pursuant to its urban renewal powers.

13. Article VI, § 11(g)(1) provides, in relevant part:

(ii) After opening the bids, the Board of Estimates shall award the contract, as an entirety to the lowest responsive and responsible

ally, the purpose of competitive bidding is "to prevent favoritism and collusion and thereby procure public improvements at the lowest cost to the taxpayers." *Bd. of Ed. v. Allender,* 206 Md. 466, 475, 112 A.2d 455, 459 (1955); *Bennett v. Baltimore,* 106 Md. 484, 68 A. 14 (1907) (interpreting Baltimore Charter competitive bidding requirements). The language of Article VI, § 11(g)(1) that requires the BOE to accept the lowest bid or reject all bids confirms that the competitive bidding procedures established therein serve the same purpose. Section 11(g) applies to "all bids made to the City in response to the formal advertising procedures contained in [§ 11]." Applying § 11(g) to the sale of City property, however, would require the City to accept the lowest bid for the property. This is entirely inconsistent with one of a seller's main objectives—to obtain the highest value for the property.[14] Therefore, because applying Article VI, § 11 to property sales contracts would reach an illogical and unreasonable result, we conclude that the Circuit Court correctly determined that dispositions of City property, pursuant to Article II, § 15 and Article 13, § 2–7, are not subject to the competitive bidding requirements of Article VI, § 11. See *D & Y, Inc. v. Winston,* 320 Md. 534,

---

bidder or by items to the respective lowest responsive and responsible bidders, or shall reject all bids. However, whenever alternative bids are invited for two or more different things, then, after all bids have been opened, the Board may select the particular thing that will be procured, and shall award the contract to the lowest responsive and responsible bidder for that particular thing.

(iii) In the event of tie bids, the using agency, with written notice to the Department of Finance, shall make a written recommendation and report to the Board of Estimates setting forth all pertinent considerations and the reasons for its recommendation. The Board, after also considering the recommendation of the Department of Finance, may then award the contract in its discretion, as long as the total cost to the City does not exceed the amount of the tie bid.

**14.** The process at issue in this case, through which the BDC solicited proposals that would maximize the value transferred to the City as measured by purchase price and the potential to achieve the City's renewal objectives, is more analogous to a modified auction-style competitive bidding than to a traditional competitive bidding process seeking the lowest bidder.

538, 578 A.2d 1177, 1179–80 (1990) ("It has been called a golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." (internal quotation marks and citations omitted)).[15]

Even though City contracts involving solely the disposition of property for redevelopment are not subject to competitive bidding requirements, we must still consider whether the LDA was a public work contract rather than a sales contract. 120 West Fayette asserts that the LDA is a public work contract because the RFP solicited proposals from a developer, not a buyer, and the LDA described a development project in terms common to public works contracts rather than terms common to property sales agreements. 120 West Fayette further argues that the LDA is a public work contract subject to competitive bidding requirements because the LDA's purpose is to effect urban renewal, "a decidedly public function." 120 West Fayette asserts that the public nature of the development is further evidenced by the City's "ongoing control" of the development after the transfer of the property to Lexington Square. Moreover, 120 West Fayette argues that the LDA is a public work contract because it requires expenditure of City funds to obtain any unowned property subject to the LDA, to relocate any remaining business within the "Superblock," and to reimburse Lexington Square for the actual cost of any environmental remediation, demolition, and streetscape improvements completed after the purchase of the property.

In response, the City argues that the LDA is not a public work contract. The City asserts that a public work contract is one in which the City is "**spending** public funds to acquire goods or services for the City to use" and, in this case, the City is receiving money from Lexington Square for the sale of

---

**15.** This is not to say, of course, that all exercises of the City's urban renewal authority are exempt from the competitive bidding requirements.

the "Superblock." (Emphasis in original). Additionally, because the Charter does not expressly define public work, the City suggests that we refer to the definition of public work in the State's Prevailing Wage Law. As to whether the LDA is paid for by public money, the City asserts that it is not paying for the construction or development of the "Superblock" and that the acquisition of the properties comprising the "Superblock" involves expenditures entirely separate from the LDA with Lexington Square.

 Maryland case law and legislative history shed no light on the meaning of public work as it appears in Art. VI, § 11(b). Thus, our interpretation of the provision shall be governed by the "ordinary and natural meaning" of the words. *O'Connor*, 382 Md. at 113, 854 A.2d at 1198. Black's Law Dictionary defines "public works" as "[s]tructures (such as roads or dams) built by the government for public use and paid for by public funds." 1639 (8th ed. 2004); *see also Kramer v. Liberty Prop. Trust*, 408 Md. 1, 21, 968 A.2d 120, 131 (2009) (referring to the dictionary to determine the ordinary meaning of a statutory term). Not only is this definition consistent with the commonly understood meaning of public work but also it is consistent with the definition of public work established by the Maryland Prevailing Wage Law, Md.Code Ann. (2009 Repl.Vol.) § 17–201 *et seq.* of the State Finance & Procurement Article, and the definitions adopted in many of our sister jurisdictions.[16] § 17–201(j) of the State Finance & Procurement Article (" '[P]ublic work' means a structure or work, including a bridge, building, ditch, road, alley, water-

---

**16.** The Prevailing Wage Law was enacted in 1969 and

requires every public body authorized to contract for public works to request the Commissioner of Labor and Industry to determine the prevailing rates of wages and fringe benefits for workmen in the locality in which the work is to be performed, and the act further makes it mandatory upon the contractor to whom the contract is awarded and all sub-contractors under him to pay the specified rates to all workmen and apprentices employed by them in the execution of the contract.

*Demory Bros., Inc. v. Bd. of Public Works*, 273 Md. 320, 321–22, 329 A.2d 674, 675 (1974).

work, or sewage disposal plant, that: (i) is constructed for public use or benefit; or (ii) is paid for wholly or partly by public money."); *see also, e.g.,* Mo.Rev.Stat. § 290.210(7) (2000) (" 'Public works' means all fixed works constructed for public use or benefit or paid for wholly or in part out of public funds."); Pa. Stat. Ann. § 165–2(5) (" 'Public work' means construction, reconstruction, demolition ... done under contract and paid for in whole or in part out of the funds or a public body[.]"); *Bessemer Water Serv. v. Lake Cyrus Dev. Co.,* 959 So.2d 643, 650 (Ala.2006) ("The construction, repair, renovation, or maintenance of public buildings, structures, sewers, waterworks, roads ... as well as any other improvement to be constructed, repaired, renovated, or maintained on public property and to be paid, in whole or in part, with public funds[.]" (internal quotation marks, citations, and emphasis omitted)); *Raley v. Cal. Tahoe Regional Planning Agency,* 68 Cal.App.3d 965, 137 Cal.Rptr. 699, 710 (1977) ("For general purposes public works are defined as 'fixed works (as schools, highways, docks) constructed for public use or enjoyment [especially] when financed and owned by the government.' " (internal citations omitted)); *Carson–Tahoe Hosp. v. Bldg. & Constr. Trades Council of N. Nev.,* 122 Nev. 218, 128 P.3d 1065, 1067 (2006) ("A public work is defined as any project for the new construction, repair, or reconstruction of ... a project financed in whole or in part from public money[.]" (internal quotation marks and citations omitted)).

 To determine whether a particular project constitutes a public work—a project built by the government for public use and paid for by public funds—courts perform a fact-intensive analysis that employs various factors, none of which is determinative. *L. Suzio Concrete Co. v. New Haven Tobacco, Inc.,* 28 Conn.App. 622, 611 A.2d 921, 925 (1992) ("While the cases ... have identified various factors that are used in determining whether a particular construction project qualified as a public work ... no one factor is determinative."); *see also Vulcan Affordable Housing Corp. v. Hartnett,* 151 A.D.2d 84, 545 N.Y.S.2d 952, 953–54 (1989) (holding that a housing development project was not a public work contract because

the structure was not for public use, was not owned by the public, was not open to the public, and was not intended for public enjoyment).

A project's primary purpose is often indicative of whether that project is for public use. *Daniels v. City of Ft. Smith*, 268 Ark. 157, 594 S.W.2d 238, 241 (1980) (holding that an industrial facility was not for public use, in part, because it only indirectly benefitted the public); *Hart v. Holtzman*, 215 A.D.2d 175, 626 N.Y.S.2d 145, 146 (N.Y.App.Div.1995) (considering whether the primary objective and function of the project is public); *R.I. Bldg. & Constr. Trades Council v. R.I. Port Auth.*, 700 A.2d 613, 616 (R.I.1997) (weighing heavily "the nature of the use to which the ultimate project is to be put rather than the source of the funding"). When a developer's primary motivation to construct a project is private economic benefit, that project is not for public use even if it confers upon the public secondary, incidental benefits such as economic development, neighborhood revitalization, employment opportunities, or additional affordable housing. *See Daniels*, 594 S.W.2d at 241 (citing reduced unemployment and economic improvement as indirect public benefits); *L. Suzio Concrete Co.*, 611 A.2d at 925 (describing economic development as an incidental, rather than primary benefit, of a private construction project); *Town of Normal v. Hafner*, 395 Ill.App.3d 589, 335 Ill.Dec. 455, 918 N.E.2d 1268, 1274 (2009) (noting that economic development resulting from private construction is an incidental public benefit); *Hart*, 626 N.Y.S.2d at 145–46 (determining that low-income housing construction was to benefit primarily private developers and to benefit secondarily the public); *R.I. Bldg.*, 700 A.2d at 615–16 (concluding that an economic development project was not a public work project because it was primarily intended for private commercial and industrial pursuits).

The LDA's avowed purposes—to provide "quality jobs for City residents," generate additional tax revenues, create "opportunities for minority ... and women business enterprises ... to participate in the ownership and development," and to

contribute "to the City's long term economic growth objectives,"—are unequivocally public. Nevertheless, the project at issue is not for public use. *See Erie County Indus. Dev. Agency v. Roberts*, 94 A.D.2d 532, 465 N.Y.S.2d 301, 306 (1983) ("The promotion of economic development is an incidental benefit which is distinct from the primary objective and function of this project as a private business."); *cf. Cattaraugus Cmty. Action, Inc. v. Hartnett*, 166 A.D.2d 891, 560 N.Y.S.2d 550, 551 (1990) ("The public purpose behind the financing scheme of a project should not be confused with the private purpose or function of the venture itself."). Even though the LDA is intended to benefit the public by revitalizing the neighborhood and stimulating the economy in and around the "Superblock," the public benefit is indirect and subsidiary to the primary and direct benefit to Lexington Square, which is developing the "Superblock" for private financial gain. *See Daniels*, 594 S.W.2d at 241 (holding that an industrial facility intended to spur economic development was not for public use); *L. Suzio Concrete Co.*, 611 A.2d at 925 (holding that the "publicly assisted construction of buildings for private use" was not for public use because economic development was secondary purpose); *Hafner*, 335 Ill.Dec. 455, 918 N.E.2d at 1274 (holding that a private housing development was not for public use); *60 Mkt. St. Assocs. v. Hartnett*, 153 A.D.2d 205, 551 N.Y.S.2d 346, 348 (N.Y.App.Div.1990) (holding that the construction of a building to house the county social services department was not for public use because the primary goal was private profit); *Hart*, 626 N.Y.S.2d at 146 (holding that a low-income housing development was not for public use); *R.I. Bldg.*, 700 A.2d at 616 (holding that a commercial economic development project was not for public use).

■ Of course, the primary purpose of a project is only one factor in the public use analysis. Whether a project is for public use also depends on whether the completed project will be government owned or operated and accessible to the general public. *See Lake Cyrus Dev. Co.*, 959 So.2d at 650 (considering whether the project was on public property); *Daniels*, 594 S.W.2d at 240–41 (considering ownership of the buildings

and property involved in the project and accessibility to the general public); *Hafner*, 335 Ill.Dec. 455, 918 N.E.2d at 1274 (concluding that the redevelopment project at issue was not a public work contract because the project consisted of building private residences rather than public fixtures, did not include a public work facility, and was not a public service provider); *Carson–Tahoe Hosp.*, 128 P.3d at 1067–68 (holding that hospital construction was not a public work contract because the hospital was constructed on private property); *Elliott v. Morgan*, 214 Wis.2d 253, 571 N.W.2d 866, 870–71 (Ct.App.1997) (holding that improvements to a city river walk did not constitute a public work project because it was not operated by the city and was not for city use).

The LDA expressly provides that "the City hereby agrees to sell its fee simple interest" in the property comprising the "Superblock" to Lexington Square and that Lexington Square "agrees to purchase the Property from the City." The City will not retain an ownership interest and will not operate any of the completed facilities. Moreover, by transferring public property to a private entity, which may limit the general public's access to the property, the LDA ensures that any projects completed pursuant to the LDA are not for the general public use. *Cf. Cattaraugus Cmty. Action*, 560 N.Y.S.2d at 551 (holding that a privately developed and owned home that limited access to only homeless young mothers was not a public work project). The construction contemplated by the LDA, private residential and commercial properties, neither publicly owned nor open to the general public and only indirectly benefitting the public, is not a project for public use. *See R.I. Bldg.*, 700 A.2d at 615 ("By no stretch of the imagination can the [processing] plant be considered a public building; it is not open to the general public and no governmental functions are conducted on its premises." (internal quotation marks and citations omitted)).

To determine whether a project is funded wholly or in part by the government, the most obvious consideration is whether any government funding associated with the project

directly pays project costs. *See Lake Cyrus Dev. Co.*, 959 So.2d at 650 (considering whether the city paid for part of the construction of a waterworks project); *Hafner*, 335 Ill.Dec. 455, 918 N.E.2d at 1274 (rejecting the argument that city payment of thirty percent of a developer's interest payment on private loans to finance a redevelopment project was tantamount to funding the project); *Carson–Tahoe Hosp.*, 128 P.3d at 1067–68 (holding that a hospital was not publicly funded because hospital public revenue bond financing did not "obligate county funds" and no public body was party to the construction contract).

On its face, the LDA does not obligate the City to fund construction within the "Superblock." Schedule D of the LDA provides that "[t]he purchase price payable by [Lexington Square] will be $21,613,100 less the cost of demolishing and remodeling the Property." Moreover, the LDA provides that Lexington Square owed a $100,000 deposit upon signing the LDA and an additional payment upon closing that would bring Lexington Square's total payments to ten percent of the purchase price. Lexington Square will pay the remaining balance, up to 50 percent, of the purchase price over time as construction is completed. After construction is complete, Lexington Square must pay the remaining fifty percent of the purchase price, plus 6 percent interest, at intervals set by the LDA. Although the City is permitting Lexington Square to pay the purchase price over time, the LDA's terms make clear that the City is not directly funding construction. At no point will the City advance construction costs or any other development costs to Lexington Square, and, as noted, Lexington Square must pay interest on the fifty percent of the purchase price paid in installments after construction is completed.

Nevertheless, 120 West Fayette contends that the City's acquisition of any unowned property subject to the LDA and payment for relocation of any remaining business within the "Superblock" constitute project funding. In *Demory Bros.*, we addressed whether the cost of land acquisition for a school construction project constituted construction costs as contemplated by the Prevailing Wage Law. 273 Md. at 329–330, 329

A.2d at 679. We held that "[c]onstruction costs, in the accepted sense, are the costs of the improvements or structures located on a site, and ... acquisition is not to be considered a cost of construction of public works[.]" *Id.* at 330–31, 329 A.2d at 679 (internal quotation marks omitted).

Although the Prevailing Wage Law and the Charter's competitive bidding requirements serve different purposes,[17] the *Demory Bros.* distinction between property acquisition costs and construction costs is instructive in this case. We are not persuaded that the purpose of the competitive bidding requirements, to eliminate the risk of collusion and government overspending, is served by including the costs of property acquisition within the scope of the cost of a public work project when the development site is selected and acquired apart from any contracts to develop the site. Under these circumstances, in which the property is acquired from sources other than the developer, through contracts separate from the development contract, adding the cost of the property acquisition to the cost of the development defies common sense. Once the transaction through which the property is acquired is complete, labeling the property acquisition costs as public work costs, and thereby subjecting the entire project to competitive bidding requirements, would not serve the public interest.

---

**17.** We have already discussed the purpose of the competitive bidding requirements, which is to prevent favoritism and collusion as well as to ensure that public works projects are procured at the lowest cost to taxpayers. Judge Wilner, writing for our intermediate appellate court, summarized the purpose of the Prevailing Wage Law as follows:

to assure that wage rates generally prevailing in the construction industry in particular areas are not adversely affected by major public works projects undertaken in those areas. By requiring contractors engaged in public construction to pay at least the same wage rates they would be expected to pay if engaged in non-public construction in the same community, the Legislature has endeavored to avoid unnecessary labor unrest that might especially affect public projects and delay their efficient completion.

*Barnes v. Comm'r of Labor & Indus.,* 45 Md.App. 396, 404, 413 A.2d 259, 264–65 (1980).

■■■ Additionally, 120 West Fayette argues that the purchase price offsets for the cost of environmental remediation and streetscaping improvements constitute City funding for the development of the "Superblock." The LDA provides that the purchase price for the "Superblock" will be reduced by the amount of the actual cost incurred by Lexington Square for environmental remediation and the demolition of existing improvements, the cost of which is currently estimated to be $8,000,000. The LDA also provides that the City will offset the purchase price by the cost of any streetscape improvements Lexington Square performs. Contrary to 120 West Fayette's assertions, providing financial incentives to private developers to encourage economic development and investment in areas in need of revitalization does not necessarily constitute publicly funding the development. *See Vulcan Affordable Housing,* 545 N.Y.S.2d at 954 (recognizing that "imaginative financial schemes, including giving tax exemptions to a project, [does] not transform an essentially private venture into a public one"); *Erie County Indus. Dev.,* 465 N.Y.S.2d at 306 (holding that a project is not publicly financed when "[t]he public involvement concerns only the creation of the economic conditions and incentives which will encourage and foster this type of private development").

As a practical matter, reducing the total purchase price of the property comprising the "Superblock" does not obligate the City to pay Lexington Square anything; instead, Lexington Square will merely pay the City an amount less than the $21, 613,100 purchase price set forth in the LDA. Moreover, though the City is conveying the property for a lower price in exchange for Lexington Square's performance of the necessary remediation, demolition, and streetscaping, the City is not funding that work, and, in the event that the costs of remediation and demolition exceed $10,000,000, the LDA provides that Lexington Square is responsible for the excess costs. Environmental remediation is a complicated and often expensive process, the specter of which serves as a disincentive for developers considering potential development sites. See Brian C. Walsh, *Statute, Seeding the Brownfields: A*

*Proposed Statute Limiting Environmental Liability for Prospective Purchasers*, 34 Harv. J. on Legis. 191, 199 (1997) (describing the challenges of environmental remediation as involving "uncertain cleanup standards, long delays, expenses and uncertainty in recovering costs from [potentially responsible parties], and a lack of finality"). By offsetting part of the cost of remediation up to the cap, the City avoids directly paying the difficult-to-estimate cost of remediation, limits the City's potential liability, and offers an incentive to developers. The portion of the offset that compensates Lexington Square's demolition costs similarly benefits the City while serving as an incentive to the developer. Redeveloping previously developed property may cost more than developing an open lot because the existing structures and improvements do not meet the developer's needs. The offset for demolition costs reflects the impact the cost of demolition has on the property value to the developer. Yet, the City is not contracting for the demolition and does not fund the work. As for the streetscaping, it too will be completed and paid for by Lexington Square, not the City. The corresponding purchase price reduction reflects the time, effort, and expense the developer will incur to transform the existing streetscape to accommodate the new development. Accordingly, we agree with the City that these offsets are not costs borne by the City, but rather are incentives for a developer to purchase the property "as is."

Complex financial schemes such as this one, coupled with government oversight of a development project, arguably create ambiguity as to whether a project is publicly or privately contracted. Nonetheless, we cannot conclude that the financial incentives offered to Lexington Square convert a privately funded project into a public one. "[W]here ... a public agency merely sells land to a private entity to develop for its own private purpose ... the agency has not 'contracted for' the construction, even if the agency retains some control over the type or style of the development to ensure that the development is compatible with the agency's objectives." *Portland Dev. Comm'n v. State*, 216 Or.App. 72, 171 P.3d 1012, 1017 (2007) (holding that Portland Development Com-

mission did not contract for public work, in part, because the agency would not own or use the development). Even though under the LDA the City retains the right to review and approve the final construction and design plans for the "Superblock," the City is not funding the project. Lexington Square is funding the design and planning of the "Superblock" redevelopment, and Lexington Square, not the City, will own the finished product. *See Daniels,* 594 S.W.2d at 240 (concluding that an industrial facility was not publicly funded because financing from the city would be repaid and a private corporation would ultimately own the property); *Nat'l R.R. Passenger Corp. v. Hartnett,* 169 A.D.2d 127, 572 N.Y.S.2d 386, 389 (1991) (holding that a railroad construction project was not a public work project even though the construction was partially funded by the state because "Amtrak, a private corporation, retains ownership of the lines to be installed in the project"); *Elliott,* 571 N.W.2d at 870 (noting " [s]ignificant is the factor that the public will not 'own' the Riverwalk" even though the project was partially funded through city grant money). Moreover, unlike typical publicly funded public works projects, the "Superblock" development's final product, whether residential or commercial, will be privately operated and maintained. *Elliott,* 571 N.W.2d at 870–71 (considering whether the project in question would be privately operated and maintained). After closing, Lexington Square and any subsequent private investors in the project will own, operate, and maintain the project; in addition, they, not the City, will bear the risks of the investment. *See Hart,* 626 N.Y.S.2d at 146 (holding that publicly financed construction project did not constitute public work contract when private developers retain the "ownership and the construction risk"); *Nat'l R.R. Passenger Corp.,* 572 N.Y.S.2d at 389 (weighing that Amtrak "bears the risk of future financial losses or physical destruction").

In sum, because the City is not directly funding the work on the "Superblock"; the financial offsets provided for in the LDA do not constitute payments for work on behalf of the City; and the City will not own, operate, maintain, or bear the

financial risks of the project, we hold that the City has not funded the redevelopment of the "Superblock." Accordingly, we hold that the LDA is not a public work contract as contemplated by Art. VI, § 11 and, therefore, is not subject to the competitive bidding requirements set forth in that same section.

## IV.

We shall now turn to the issue of whether the RFP process through which the BDC considered and recommended the Lexington Square proposal to the BOE constituted an unlawful delegation of the City's urban renewal powers that renders the LDA *ultra vires.*

120 West Fayette argues that the City unlawfully delegated urban renewal powers to the BDC. The delegation was unlawful, according to 120 West Fayette, because the BDC is not a qualified entity to exercise authority under Article II, § 15, which allows the City to seek assistance in carrying out its renewal powers from any "suitable board, commission, department, bureau or other agency." 120 West Fayette contends, more specifically, that because the BDC does not qualify to exercise renewal authority under Article II, § 15, the BDC had no authority to consider the proposals submitted in response to the RFP outside of public meetings, to encourage the prospective developers to include additional partners in the project, to sign the ENP, to amend the site to include the former Greyhound terminal, or to make a recommendation to the BOE. Alternatively, 120 West Fayette argues that, even if the City could properly delegate some authority to the BDC, the BDC exercised non-delegable discretionary authority when it amended the property to be developed under the RFP and determined which developer would be granted the ENP. 120 West Fayette also argues that the comprehensive manner in which the BDC considered the proposals and winnowed down the eligible developers before making a recommendation to the BOE essentially usurped the BOE's authority to choose the developer. In other words, 120 West Fayette asserts that, because the BDC presented the BOE

with a single recommendation, the BDC effectively gave the BOE no choice but to agree with the recommendation, thereby stripping the BOE of its discretion and rendering approval of the LDA a mere formality.

The City proffers that, rather than exercising its sole discretion to choose a developer, the BDC offered professional consulting services to the City to assist the BOE with choosing a developer. To carry out this function, the City argues that the BDC's solicitation and consideration of proposals and eventual recommendation to the BOE were administrative and ministerial functions delegated to the BDC by the City and the BOE in Ordinance 99–423. The City contends that these actions were not discretionary because the BDC could only consider proposals and make a recommendation and never had authority to enter into the LDA on the City's behalf.[18] More-

---

**18.** Ordinance 99–423 was adopted by the City Council on April 26, 1999. Sections 4 and 5 of the ordinance assign specific responsibilities to the BDC with respect to the development of the "Superblock." The ordinance provides, in relevant part:

SECTION 4. AND BE IT FURTHER ORDAINED; That the Baltimore Development Corporation acting pursuant to its contract with the Mayor and City Council by and through the Department of Housing and Community Development, and working cooperatively with the Relocation staff of the Department of Housing and Community Development, commits to:
(1) compiling and maintaining a comprehensive record of all existing business owners who express an interest in returning to the redeveloped areas. The record will include, but not be limited to, name, address, phone and fax numbers, type of business interest, size (square footage) of business interest, desired cost range, etc.;
(2) arranging and attending meetings between the developers and those interested businesses as soon as developers are selected by the City for one or more of the redeveloped areas; and
(3) working with the interested businesses and the developers to propose, if financial necessity is indicated, financial assistance packages under existing programs including, but not limited to, City, State, and Federal below-market-rate loans and/or grants through Baltimore Development Corporation or other entities.
SECTION 5. AND BE IT FURTHER ORDAINED; That the Baltimore Development Corporation (BDC), as described above in Section 5, commits to the following regarding the processes to work with developers and interested groups/individuals to encourage the preservation/adaptive reuse of existing buildings:

over, though the BDC issued the RFP, considered the proposals submitted in response to the RFP, and perfected its recommendation to the BOE without the direct involvement of the DHCD, the City asserts that, because the BOE made the final decision to enter into the LDA with Lexington Square, the BDC did not usurp the BOE's "discretionary or legislative" authority to select the developer and approve the LDA. The City further contends that the BDC's recommendation did not present the BOE with a false choice, but rather presented the BOE with a proposal that the BOE evaluated, amended, and discussed before unanimously approving the LDA.

■ The City may exercise only those powers expressly granted by the General Assembly. *See Piscatelli v. Bd. of Liquor License Comm'rs*, 378 Md. 623, 634–35, 837 A.2d 931, 937–38 (2003) ("[T]he General Assembly has the authority to determine what powers are to be exercised by Baltimore City[.]"). "Most of the express powers granted by the General Assembly ... are contained in ... Article II of the Balti-

---

(1) In all BDC-issued Request for Proposals (RFPs) and in public advertisements that invite further developer responses to a BDC-received unsolicited proposal, BDC commits to include the following statement:
Developers are encouraged to submit proposals which include the preservation and rehabilitation, where feasible, of other structures within the area.
(2) Following the receipt of responses to RFPs and of responses to advertisements regarding unsolicited proposals, BDC will require the respondents to present architectural designs and economic data with the objective of preserving/adaptively reusing as many existing buildings as is feasible (both from design and economic points of view) within the relevant areas.
(3) The selected development team will be asked to study the design and economic implications of at least one alternative in which additional buildings may be preserved/adaptively reused. Representatives of all groups expressing an interest in this matter will be invited by BDC to participate in meetings with the selected development team. Such representatives will be asked by BDC to express their views verbally and in writing regarding the development team's proposal, and if they desire, to present design/economic alternatives for consideration by the development team and BDC. BDC will respond in writing within 21 calendar days of the submission to any such alternatives.
(Underlining omitted).

more City Charter for the City of Baltimore." *Id.* at 634, 837 A.2d at 937–38. Article II grants the City the "full power and authority" to "sell, lease, convey, transfer or otherwise dispose of any [land acquired for development or redevelopment]" to a private entity for redevelopment and to exercise that power "by ordinance." Article II, § 15(c). Article II, § 15(g) further provides that the City has the authority "to vest jurisdiction or authority to exercise or perform all or any part" of the authority granted in Article § 15(c) "in any suitable board, commission, department, bureau or other agency of the Mayor and City Council." Accordingly, the City adopted Article 13, which established the DHCD and granted it "all of the powers of [the City] necessary or convenient, from time to time, to carry out and effectuate any and all of the functions and purposes mentioned in [Article 13, Subtitle 2]," including the power to dispose of property for redevelopment purposes. Article 13, § 2–7. Moreover, Article 13, § 2–7(n) provides that the DHCD,

> [s]ubject to the prior approval of the [BOE], to contract, from time to time, with any private, public, or quasi-public corporation, partnership, association, person, or other legal entity for the furnishing of consulting, planning, designing, engineering, or other technical or specialized services in connection with the duties, powers, and functions of the [DHCD].

Similarly, Article 13, § 2–7(o) provides that the DHCD, subject to the BOE's approval, may "employ or hire, from time to time, by contract … persons possessing technical or specialized skills in connection with the duties, powers, and functions of the [DHCD]."

First, we shall address the legitimacy of the City contract with the BDC. 120 West Fayette argues that the City's reliance on the BDC's assistance with the redevelopment of the "Superblock" violates Article II, § 15 because the BDC does not constitute a "suitable board, commission, department, bureau or other agency" of the City. Article II, § 15(g). We disagree. In *Carmel Realty,* we addressed whether the BDC was a public body for the purposes of the Maryland Open

Meetings Act, which requires meetings of public bodies to be open to the public. Maryland Code (2009 Repl.Vol.) §§ 10–501–10–512 of the State Government Article; *Carmel Realty,* 395 Md. at 306, 910 A.2d at 410. Section 10–502(h)(2)(i) of the act "makes multimember boards appointed by the chief executive authority of a political subdivision, which consist of at least two individuals not employed by the particular subdivision, subject to the Open Meetings Act." *Carmel Realty,* 395 Md. at 324, 910 A.2d at 421. As mentioned previously, the Mayor has "power of appointment or nomination to the Board, the power of removal over the members of the Board, and the power to appoint directors and fill vacancies for the remainder of terms of vacating directors." *Carmel Realty,* 395 Md. at 326, 910 A.2d at 422. By virtue of this authority, the Mayor controls the BDC's Board, and, because the BDC's Board conducts the activities of the BDC, we concluded in *Carmel Realty* that "the Mayor controls the City of Baltimore Development Corporation and it is, in essence, a public body under the plain language of § 10–502(h)(2)[.]" *Id.,* 910 A.2d at 422. Of particular relevance is that this conclusion rests on this Court's determination that the BDC's Board of Directors is a "board appointed by the chief executive authority of a political subdivision." Given that the board of the BDC is sufficiently subject to City control that it must comply with the Open Meetings Act, the BDC is a "suitable board" for the purposes of Article II, § 15. *See id.* at 331, 910 A.2d at 425 ("[A]ll deliberations preceding the final decisions made by the Mayor or the City Council, must be open to the public to the same extent as would any proceeding of the Mayor or City Council of Baltimore City. This is because every step of the process comprises the consideration or transaction of public business.").

■ Further validating the City's reliance on the BDC's efforts is the general principle that to carry out a specific function, such as urban development, a municipal agency may obtain assistance by contracting for professional services, subject to the approval of the BOE. *See Hughes v. Schaefer,* 294 Md. 653, 452 A.2d 428 (1982) (acknowledging that the BOE

could properly contract for professional services to obtain assistance to conduct a loan program). Article 13, § 2–7(n) expressly permits the DHCD to contract, "with any private, public, or quasi-public corporation" for the furnishing of consulting or other specialized services in connection with the DHCD's renewal authority. The BDC is a corporation that specializes in commercial, residential, industrial, and office development projects and offers to serve as a liaison between the public and private sector for the purpose of facilitating development projects. This expertise certainly would assist the redevelopment work of the DHCD, and, thus, under Article 13, § 2–7(n), the DHCD may properly contract with the BDC for services related to redevelopment projects.

Next, we shall address the lawfulness of the BDC's acts pursuant to its contract and Ordinance 99–423, which hinges on whether the BDC performed legislative or discretionary functions vested exclusively in the City or the DHCD. "The rule is plain and well established that legislative or discretionary powers or trust devolved by law or charter on a council or governing body cannot be delegated to others, but ministerial or administrative functions may be delegated to subordinate officials." *Baltimore v. Wollman,* 123 Md. 310, 315, 91 A. 339, 342 (1914). To be valid, a delegation of municipal authority must contain sufficiently specific guidelines to ensure that the delegate does not act with unfettered discretion. *Jack Lewis, Inc. v. Baltimore,* 164 Md. 146, 150, 164 A. 220, 222 (1933) (emphasizing that the permissibility of delegated authority turns on "whether the grant or delegation ... vested [the delegates] with a complete and uncontrolled discretion, or whether it vested them with mere ministerial and administrative functions[.]"). We have had few opportunities to address the delegation of municipal authority. Yet, more than 80 years ago, this Court emphasized the difficulties courts face when distinguishing between ministerial and discretionary acts:

The field has become so vast, and the things to be considered so enlarged in number and so interrelated with one another, that it has been found practically impossible to

provide in laws and ordinances specific rules and standards by which every conceivable situation can be measured and determined. The result has been that we have turned more and more to the plan of providing in our laws and ordinances general rules and standards, and leaving to administrative boards and agencies the task of acquiring information, working out the details, and applying these rules and standards to specific cases. This is not considered a delegation of legislative authority, though it probably does represent an expansion of administrative power.

*Tighe v. Osborne,* 150 Md. 452, 463, 133 A. 465, 469 (1926) (addressing whether the City could properly delegate the power to approve construction permit applications to the zoning commissioner).

■■■ More succinctly stated, the magnitude and complexity of the role of modern municipal government permits delegation subject to flexible standards as long as the process is not arbitrary and the ultimate decision is rendered by the municipality. A delegate's conduct must be subject to reasonably specific standards, but a ministerial task is not rendered discretionary merely because the applicable standards fail to address every decision the delegate might make. This approach is reflected in our analysis in *Hughes,* in which we considered whether a BOE-administered City loan program for development and redevelopment involved an unlawful delegation of discretionary power. 294 Md. at 655, 452 A.2d at 429. To administer the program, the BOE placed in four separate trusts certain municipal funds and designated two trustees to manage the trusts. *Id.* at 656, 452 A.2d at 429–30. The terms of each trust agreement provided that the trustees would review the proposed transactions involving trust funds and make recommendations to the BOE regarding the transactions and the BOE would approve or reject the transaction. *Id.* at 658, 452 A.2d at 430–31. The agreements provided, however, that the BOE could not approve any transactions unless the trustees had first favorably recommended the transaction to the BOE. *Id.* at 659, 452 A.2d at 431. Although we concluded in *Hughes* that the BOE could properly

delegate to the trustees the authority to review and recommend proposals, we held that the provision limiting the BOE's power of approval to only those proposals recommended by the trustees was an invalid limit on the BOE's discretion. *Id.* at 661–62, 452 A.2d at 432.

Just as the trustees in *Hughes* were imbued with the authority to consider and recommend proposed transactions, the BDC is authorized to consider proposals for developing the "Superblock." The trustees evaluated the proposals based on financial feasibility and whether they served the purposes of the trust, and, similarly, the BDC evaluated the proposals submitted in response to the RFP based on whether they served the Renewal Plan's purposes and the criteria set forth in Ordinance 99–423. Moreover, the ordinance charged the BDC with specific tasks and established protocols for the proposal evaluation process. Subject to these limitations, the BDC considered the proposals, met with the competing developers, and negotiated an offer with Lexington Square, contingent on BOE acceptance.

120 West Fayette makes much of the BDC's suggestions that Next Generation include HAD Baltimore, II, LLC and Nakash–Lexington, LLC in the Lexington Square development team and that the former Greyhound terminal property be included within the "Superblock." We are not persuaded that these acts exceeded the BDC's administrative and ministerial responsibilities. We noted above that, to carry out their mandate, agencies often must acquire information and apply that information in the field. *See Tighe*, 150 Md. at 463, 133 A. at 469 (describing agencies as "acquiring information, working out the details, and applying [the applicable] rules and standards to specific cases"). No set of standards can anticipate every eventuality that an agency will face; thus the standards must be flexible. By including the former Greyhound site within the RFP and introducing additional developers to the prospective development team, the BDC simply responded to the evolving facts on the ground in an effort to achieve the City's redevelopment objectives. The BDC did not usurp the City's authority to determine which properties

were redeveloped, but rather ensured that the properties the City had selected for redevelopment were offered for redevelopment. Before the BDC offered the former Greyhound terminal site as part of the "Superblock" redevelopment project, the BDC had been negotiating separately the terminal's redevelopment with the Weinberg Foundation and Arrow Parking. When those parties withdrew from negotiations, the BDC recognized an opportunity to include that site within the RFP and achieve the City's objective. Given that the BDC already had authority to negotiate the redevelopment of the site, this cannot be considered discretionary decision-making inconsistent with the BDC's administrative and ministerial delegations. Moreover, the BDC did not overstep its boundaries by recommending that additional partners with experience in Baltimore be included in the development team. Only Next Generation, not the BDC, had the authority to create the Lexington Square entity, and the formation of Lexington Square did not obligate the City in any way. Furthermore, neither the BDC's decision to include the former Greyhound terminal in the "Superblock" redevelopment site nor the BDC's decision to introduce additional partners to Next Generation interfered with or constrained the BOE's authority to approve or reject the LDA.

Yet, 120 West Fayette contends that the LDA is *ultra vires* because the City merely appears to be the decision-maker. The facts belie this contention. Under the RFP, the Mayor reviews the BDC's evaluation of the proposals and "[a]ny contract awarded by BDC ... [is] subject to approvals as required by City law, including the final approval by the [BOE]." Moreover, in a specially designated section, the RFP explicitly provides that "[a]pproval of a LDA is by action of the City's [BOE]." At all times, the potential developers had notice that the LDA could be approved only by the City. Unlike in *Hughes*, in which the BOE's approval was limited to only those proposals recommended by the trustees, the City's hand is not forced. The BOE's approval is not contingent on a favorable recommendation from the BDC. The BOE could have rejected the BDC's recommendation and requested that

the BDC reconsider other proposals or re-solicit proposals for the project. *Cf. Hughes,* 294 Md. at 661–62, 452 A.2d at 432 (permitting the BOE to approve only those proposals that had received favorable recommendations from the trustees and, therefore, effectively giving the trustees veto power over the BOE). Instead, before unanimously approving the proposal at a public meeting, the BOE reviewed the proposal, solicited additional information about the proposal from the BDC president and staff members, and requested that the proposed LDA be amended to include a cap on the purchase price offsets. This amendment is reflected in the LDA. For the aforementioned reasons, we agree with the Circuit Court that the City's contract with the BDC was not an improper delegation of discretionary authority. Therefore, we hold that the LDA is not *ultra vires.*

## V.

We shall now address the remaining issue: whether the Circuit Court properly granted the City's motion to dismiss Count Two of 120 West Fayette's amended complaint, seeking a declaratory judgment that the proposed plans for the "Superblock" are subject to the MOA and the Renewal Plan standards, because the controversy was not ripe for judicial consideration.

120 West Fayette argues that Count Two of the amended complaint presents a controversy ripe for adjudication because, to date, Lexington Square has not submitted to the City proposed plans that conform to the MOA and the Renewal Plan. Consequently, 120 West Fayette contends that Lexington Square does not intend to comply with the standards set forth in the MOA and the Renewal Plan. To further support this contention, 120 West Fayette points to a deposition in which, when asked, "Would you proceed [with the demolition of historical buildings within the "Superblock"] without the Maryland Historic[al] Trust giving you the go-ahead or saying it complies with the MOA?," BDC president Mr. Brodie responded, "I would ask for legal advice." 120 West Fayette further argues that BDC inquiries regarding the applicability

of the standards to a proposed twenty-seven-story high rise within the "Superblock" demonstrate Lexington Square's intent to flout the MOA and Renewal Plan standards. To preempt any such violations, 120 West Fayette requests that we declare the applicable height standards within the "Superblock" and the enforceability of the MOA and the Renewal Plan standards to development within the "Superblock."

The City responds that a declaratory judgment is improper at this juncture because 120 West Fayette has no evidence that Lexington Square or the City intends to circumvent the MOA or the Renewal Plan standards. The City argues that, to date, no plans have been finalized and that the City and Lexington Square are in the midst of negotiating a plan that conforms to the applicable standards. Moreover, the City disputes that Mr. Brodie's statement, that he would "ask for legal advice" regarding whether he could proceed with the project without MHT approval, indicates anything more than that he would attempt to do what was legal under those circumstances. As to the proposed twenty-seven-story tower, the City asserts that the tower is part of a "conceptual design" that has not been adopted or approved. For these reasons, the City contends that any declaration regarding the applicability of the MOA and Renewal Plan standards would be tantamount to an "opinion on an issue that may never ripen into a judicial dispute" and therefore would be premature.

The Maryland Uniform Declaratory Judgments Act, Maryland Code (2006 Repl.Vol.) § 3–401 et seq. of the Courts & Judicial Proceedings Article ("C.J."), provides that "a court of record within its jurisdiction may declare rights, status, and other legal relations whether or not further relief is or could be claimed." C.J. § 3–403(a). Generally, a motion to dismiss "'is rarely appropriate in a declaratory judgment action.'" *Broadwater v. State,* 303 Md. 461, 466, 494 A.2d 934, 936 (1985) (quoting *Shapiro v. Bd. of County Com'rs,* 219 Md. 298, 302–03, 149 A.2d 396, 398–99 (1959)).

Where a bill of complaint shows a subject matter that is within the contemplation of the relief afforded by the declar-

atory decree statute, and it states sufficient facts to show the existence of the subject matter and the dispute with reference thereto, upon which the court may exercise its declaratory power, it is immaterial that the ultimate ruling may be unfavorable to the plaintiff. The test of the sufficiency of the bill is not whether it shows that the plaintiff is entitled to the declaration of rights or interest in accordance with his theory, but whether he is entitled to a declaration at all; so, even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree.

*Id.,* 494 A.2d at 936 (quoting *Shapiro,* 219 Md. at 302–03, 149 A.2d at 398–99).

When a complaint fails to allege a justiciable controversy, however, a motion to dismiss is proper. *See* C.J. § 3–409(a)(1) (authorizing declaratory judgments only when the complaint establishes that "[a]n actual controversy exists between contending parties"); *Boyds Civic Ass'n v. Montgomery County Council,* 309 Md. 683, 689, 526 A.2d 598, 601 (1987) ("[U]nder the statute, the existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action." (internal quotation marks and citations omitted)). "A controversy is justiciable when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." *Reyes v. Prince George's County,* 281 Md. 279, 288, 380 A.2d 12, 17 (1977). "To be justiciable the issue must present more than a mere difference of opinion, and there must be more than a mere prayer for declaratory relief. Indeed, the addressing of non-justiciable issues would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State." *Hatt v. Anderson,* 297 Md. 42, 46, 464 A.2d 1076, 1078 (1983) (internal citations omitted). A declaratory relief action that requests adjudication based on facts that have yet to occur or develop lacks ripeness and should be dismissed for failure to allege a justiciable controversy. *See Hickory Point P'ship v. Anne*

*Arundel County,* 316 Md. 118, 130, 557 A.2d 626, 632 (1989) ("Generally, an action for declaratory relief lacks ripeness if it involves a request that the court declare the rights of parties upon a state of facts which has not yet arisen, or upon a matter which is future, contingent and uncertain." (internal quotation marks and citations omitted)).

We agree with the Circuit Court that 120 West Fayette has failed to allege a justiciable controversy. Our review of the record, which assumes the truth of all well-pleaded facts and construes all "reasonable inferences drawn from them, in a light most favorable to the non-moving party," reveals nothing that rises to the level of an actual dispute between the parties that merits the declaratory judgment requested. *120 West Fayette St.,* 407 Md. at 261, 964 A.2d at 666 (internal quotation marks and citations omitted). 120 West Fayette effectively alleges that the proposed plan for the "Superblock" will violate the MOA and the Renewal Plan, but the City has not yet adopted or approved any plans. *See Boyds,* 309 Md. at 690, 526 A.2d at 602 (" 'In a declaratory judgment proceeding, the court will not decide future rights in anticipation of an event which may never happen, but will wait until the event actually takes place[.]' ") (quoting *Tanner v. McKeldin,* 202 Md. 569, 579, 97 A.2d 449, 454 (1953)); *Hickory Point P'ship,* 316 Md. at 131, 557 A.2d at 632 ("The disagreement over which declaratory relief is sought must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding[.]" (internal quotation marks and citations omitted)).

Moreover, Mr. Brodie's statement that he would seek legal advice if faced with the question of whether to proceed with demolition without MHT approval and in violation of the MOA does not even rise to the level of a threat to violate the MOA or undermine the MHT. *Cf. Hatt,* 297 Md. at 46–47, 464 A.2d at 1079 (dismissing a firefighter's request for declaratory relief on ripeness grounds because the fire department regulation prohibiting certain speech had not been applied or even threatened to be applied and "[a]t most, [the firefighter] speculate[d] as to what might happen under the regulation").

The RFP and the LDA both require the development to conform to the MOA and the Renewal Plan, and the record evidences nothing from which we can infer that the City would approve plans to the contrary. *See Boyds,* 309 Md. at 691, 526 A.2d at 602 (explaining that the ripeness doctrine's purpose is "to ensure that adjudication will dispose of an actual controversy").

Finally, just as we are unable to infer from the *proposed* designs and project plans that Lexington Square or the City intends to violate the MOA or the Renewal Plan, we are unable to infer bad faith from the *proposed* twenty-seven-story tower that allegedly violates the height restrictions in the Renewal Plan. As 120 West Fayette alleges in its complaint, the drawings and plans for that tower "have yet . . . to be adopted, approved, or authorized." The possibility remains that Lexington Square will propose, and the City will approve, plans that, in accordance with the LDA's requirements, conform to the MOA and the Renewal Plan. Accordingly, we hold that the Circuit Court properly granted the City's motion to dismiss Count Two of the amended complaint on the grounds that 120 West Fayette failed to alleged facts ripe for adjudication and thus failed to establish a justiciable controversy.[19]

## VI.

In sum, we hold that the LDA with Lexington Square is not subject to the Article VI, § 11 competitive bidding requirements because the LDA is not a public work contract. The project is neither for public use nor publicly funded. We

---

**19.** We affirm the dismissal of Count Two of 120 West Fayette's amended complaint without prejudice to 120 West Fayette's right to reassert the claim and seek appropriate relief when the alleged facts have developed to the point that a violation is imminent or has occurred. *See Boyds,* 309 Md. at 692, 526 A.2d at 602 ("The imminence and practical certainty of the act or event in issue, or the intent, capacity, and power to perform, create justiciability as clearly as the completed act or event, and is generally easily distinguishable from remote, contingent, and uncertain events that may never happen and upon which it would be improper to pass as operative facts." (internal quotation marks and citations omitted)).

further hold that the LDA is not *ultra vires* because the process through which the LDA was granted did not constitute an improper delegation of the City's discretionary authority as related to urban renewal and redevelopment of the "Superblock." Finally, we hold that, because none of the allegedly violative design plans for the "Superblock" has been finalized or approved, and none of the facts evidences the City's intent to adopt a proposal that violates the MOA or the Renewal Plan, 120 West Fayette failed to allege facts sufficiently ripe to rise to level of a justiciable controversy. For these reasons, we affirm the judgment of the Circuit Court; dismissal of Count Two of 120 West Fayette's amended complaint shall be without prejudice.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

Chief Judge BELL and Judge BATTAGLIA join in the judgment only.